DRENNEN and others *v.* LONDON ASSURANCE CORP.

*(Circuit Court, D. Minnesota. June 26, 1884.)*

FIRE INSURANCE—AVOIDANCE OF POLICY—INTRODUCTION OF NEW PARTNER INTO FIRM ASSURED.

> The sale or transmutation of the various interests between partners themselves, and nobody else having the control, and leaving the possession where it was, does not invalidate the policy; but the introduction of a new partner, with an investiture of an interest in him which he did not have before, *does* invalidate the policy.

On Motion to Find for Defendant.

*L. J. C. Drennen* and *Rea, Kitchel & Shaw,* for plaintiffs.

*Cameron, Losey & Bunn* and *C. K. Davis,* for defendant.

MILLER, Justice. This case was argued upon certain questions of law. It seems that the plaintiffs, who have brought the suit upon two policies of the London Assurance Corporation, were, at the time the policies were made, the owners of a stock of goods in Minneapolis, which was the subject of the insurance. The loss by fire is apparently admitted as stated, and the only issue raised by the defense grows out of two conditions of the policies, which are supposed to relate to the same subject. One of these conditions is that "if the property insured be sold or transferred, or any change takes place in the title except by succession, by reason of the death of the assured, whether by legal or judicial process, or voluntary transfer or conveyance, this policy shall be void." The other provision is that "if the interest of the assured in the property be any other than entire, unconditional, and sole ownership in the property, for the use and benefit of the assured; or if the building insured stands upon leased ground, or the property has been sold and delivered, or otherwise disposed of, so that all interest or liability on the part of the assured has ceased, this insurance upon all such property shall immediately terminate."

A point raised by the plaintiff in the construction of this policy is that the clause I have read last, in the fourth paragraph of this insurance policy, is a limitation and a qualification of the one I have first read. The first one is, "and if the property be sold or transferred, or any change takes place in the title or possession, then the policy is void." The last one is that "when the property has been sold and delivered, or otherwise disposed of, so that the liability of the assured has ceased, this insurance shall terminate." I do not think that they have anything to do with each other. They relate to distinct phases of what may be done by the owners of the property after the insurance policies are executed. The latter does but little more than explain and qualify the universal principle of law, that, when a man has insured property and ceases to be the owner, or have any interest in it, although it may be burned during the life of the

policy, he cannot recover anything, for the very obvious reason that he has nothing to recover; he has no interest in the property; he has sustained no loss, and therefore can recover nothing; that has been decided over and over again. It is also one of the conditions of these policies, in order to prevent their assignment without the consent of the insurance company, that, when a man sells and parts with his title and ownership of the property, he ceases to be insured, and has nothing to insure, and if the property is burned, it is somebody else's property. This provision in question has relation to that, and is intended to qualify, and, to some extent, perhaps, to limit, the common law, for if it is sold and not delivered, he probably could recover.

"When the property has been sold and delivered, or otherwise disposed of, so that all interest or liability on the part of the assured has ceased, this insurance on such property shall immediately terminate." This is rather for the benefit of the assured; a sale of part of the property does not forfeit his right to insurance on the balance. Possibly, a sale without a delivery, if delivery was essential, would not forfeit his insurance; but this relates simply to a sale of property in whole or in part, and is intended to qualify the rule of the law that would prevail without it.

The other relates to a different affair: "If the property be sold or transferred, or any change takes place in the title or possession." Many changes may take place in the title, and also in the possession, without a sale or transfer of the property to another party; for instance, a sale by one partner to another has been held by the courts not to be such a sale or transfer as is included in this policy, and for the very obvious reason that the possession does not change; it remains where it was,—the title remains, perhaps, in the firm, although one member of the firm may have gone out; but the question we have to solve is whether the introduction of a new partner into the partnership firm, whose goods are insured, is such a change as vests him with an interest which he did not have before, and vests another man with a right of control of the possession, and to have charge of the property, and will avoid this policy. Without going on to cite the authorities, we are both of the opinion that this is such a change as by that language was intended to avoid and forfeit the policy.

The sale or transmutation of the various interests between the partners themselves, and nobody else having the control, and leaving the possession where it was, does not invalidate the policy; but the introduction of a new partner, with an investiture of an interest in him which he did not have before, does avoid the policy.

There are two things with regard to which the insurers are always cautious, tenacious, and anxious: one of them is the character of the men with whom they make the contract, and the other is the character of the man who has possession of the property, especially if it be movable property that is insured; and it is easy to see why

this is so.   They may very well know that the man or men with whom they deal when the contract is made, are cautious, prudent business men, honest, and for a long time successful in business; with those men they contract without hesitation.   They have the right to know who those men are with whom they contract, and the character of the men with whom they contract with regard to the possession of the property.   They make a contract with A., because they know him, or because they have have heard of his character; because they understand that he is honest and fair; and they deal with him just as you would deal with one whom you know to be reliable; you will seek to deal with honest men only.   Now, it is against all the principles of contracts to say that in dealing with one man or with two men, that those two can afterwards, acting without the consent of the other party, introduce another man into the contract, who has all the rights and all the control which those two had before, because that man may be a scoundrel, may be known to be a scoundrel by the insurance company; and if that rule prevails, the other parties have a right to introduce the veriest scum of the earth, and men who have half a dozen times been engaged in the destruction of property to get the insurance.   So you may sell the goods insured, but you cannot sell the policy unless the company agrees to it.   We are of the opinion that if Mr. Arndt was within the meaning of that policy, introduced into that partnership, and became a member of it before the loss, and acquired an interest in the goods, that the policy was forfeited.

The question whether he was so introduced, as presented to the jury and the court at this time, rests almost entirely upon the construction of a written contract, which defines the relation of these parties.   There is some verbal testimony on this subject introduced by defendant before the policy itself was introduced by the plaintiffs. As regards that testimony, I am inclined to think that some of it would be pertinent, even after the introduction of the policy; and to that alone I will advert in what I have to say about the construction of this policy.   I may as well state at the start, however, that the two opposing views which are taken of the contract are these : the one by the plaintiff is that it was simply an agreement, not for a partnership, but for the future organization of a joint-stock corporation, in which, when completed and organized, these goods shall constitute a part of the capital stock; but that, not having done so before the fire, no such change as the policy alludes to was made in the ownership of the property or its possession, but that the original partners were the sole owners at the time of the fire.   This agreement, therefore, requires a somewhat critical examination.   It says:

"This agreement, made and entered into this twenty-fourth day of May, 1883, by and between E. J. A. Drennen, F. W. Starr, and Edward Everett, who are members and constitute the firm of Drennen, Starr & Everett, all of Minneapolis, parties of the first part, and D. M. Arndt, of Sandusky, Ohio, party of the second part, witnesseth:  Said parties of the first part agree to receive into their business said Arndt, on the following conditions:  Said

Arndt is to pay into said firm for its use, on or before June 14, 1883, five thousand dollars, and said Arndt is to pay into said firm, for its use, on or before January 1, 1885, an additional sum of five thousand dollars," etc.

—The contract being signed by E. J. A. Drennen, F. W. Starr, and D. M. Arndt.

It is observed that Mr. Everett's name is not signed to this instrument; and if nothing more had been said about it, I should have said the instrument was void. But Mr. Drennen stated on the stand that Mr. Everett was away from home when the contract was signed, and that when he returned home he was informed of it and assented to it. Mr. Drennen and other witnesses testified that Mr. Arndt was in the office as book-keeper, and on this point there is no contradictory evidence. I say to the jury now, that I think they are authorized to assume that Mr. Everett was a party to this contract; so that question may be considered out of the way.

Considering this, then, to be the instrument of Drennen, Starr & Everett on the one hand, and of Mr. Arndt on the other, we are of the opinion that it takes Mr. Arndt into the partnership on the day he paid $5,000 and gave his note for the other $5,000. It provided for his having an interest in the whole firm, as I understand it, upon the payment of that money. The testimony is that his cash payment of $5,000 was made on the fourteenth of June, and he made the note for $5,000 a day or two afterwards, which was accepted by the plaintiffs. The language of this instrument is "to pay into the firm"—the firm then in existence—"for its use," on or before June 14, 1883. There was no firm that he could have paid it into except the firm of Drennen, Starr & Everett. He was to pay into that firm for their use $5,000; and, that there may be no mistake about it, this is repeated: "Said Arndt is to pay the said firm for its use, on or before the first day of January, 1885, an additional sum of $5,000." The books of the partnership and the book-keeper are introduced, and the payment of that money into the firm, as entered on their books, is found; the execution of the note and its credit is found on these books of the firm of Drennen, Starr & Everett. I cannot resist the conclusion that a primary object of this contract was, in its own language, that the said parties of the first part (that is, Drennen, Starr & Everett) were to receive into their business said Arndt, and that when he paid that money, as a condition of his being received into that business, he was paying it to said firm for *its* use, and not to the corporation to be formed; that it was to the firm of Drennen, Starr & Everett he was to pay $5,000, "for its use," on or before June 14, 1883, which he did; and that he was to pay into such firm for *its* use, on or before January 1, 1885, an additional sum of $5,000 by note, which he did, and which note they might have sold and discounted, (although it is testified that they have returned it to him;) and this was the formation of the partnership. He was received into their business,—not a future business; he paid the money into them,—the

firm,—and not the corporation to be formed. The basis of his interest is not calculated on what may have been the intention to put into the joint-stock corporation to be afterward formed, but it was based on the condition of the firm of Drennen, Starr & Everett, on the first of January, six months before, when they had taken stock, and an inventory of their debts, credits, and property, and they said: "We have now a surplus of $65,000, and on that basis we take you into this firm. You have paid your money; you have been received into the firm." He acted as a member of the firm for two or three weeks before the fire. I must hold that by this contract he came into and became a member of the partnership of the old firm, with the same rights, in proportion to the amount of interest which he had, as the other three members of the firm. His money had been invested in the goods then there. He purchased an interest in the goods and in their debts, and incurred an obligation for debts owing on the first of January, 1883. That is our view of the case.

I shall simply say to the jury that if they believe this testimony of Miss Alice O'Brian, and the books that have been produced; and if they believe Mr. Drennen's testimony that Mr. Everett consented to this arrangement made by his two partners with Mr. Arndt, that that transaction constituted a partnership in which Mr. Arndt became interested in these goods, and in such a manner as to avoid the policy, their verdict should be for the defendant.

Jury found for defendant.