In re DANA et al.

UNITED STATES v. DANA et al.

(District Court, S. D. New York. June 24, 1895.)

1. CRIMINAL LAW—REMOVAL OF OFFENDERS—REV. ST. § 1014—STATE PRACTICE TO BE FOLLOWED — INDICTMENT IN ANOTHER DISTRICT INSUFFICIENT, IF INCONSISTENT AND CONTRADICTORY—LIBEL—PLACE OF COMMITMENT.

The editor of the New York Sun was indicted in Washington for an alleged libel published first in New York and afterwards circulated in Washington. On an affidavit, stating the indictment and annexing a copy, he was arrested in New York under a warrant issued by a United States commissioner, and held for trial in Washington upon proof of identity. It appeared that he had not been in Washington. Further evidence of no criminality was excluded. The indictment charged in one count the writing and publishing of the libel in New York; in another count it charged the writing in the District of Columbia; and its averments as to Mr. Dana's own acts were uncertain. On application under section 1014, Rev. St., for an order to remove the accused to Washington for trial: *Held* (1) that this proceeding was independent of that in Washington; (2) that it must conform to the state practice; (3) that facts and circumstances showing criminality must appear by oath or affidavit, and the committing magistrate be thereby satisfied of probable cause; (4) that the accused has the right to an examination, when demanded, and to show want of probable cause; and that the evidence offered should have been received; (5) that an indictment which presents a clear and consistent statement of facts is equivalent to an affidavit thereof upon the faith of the witnesses indorsed on it; (6) that such an indictment, though secondary evidence, is receivable, and is sufficient if not controverted; (7) that where, as in libel, the place where the offense was committed is material, vague and contradictory statements in the indictment forbid its reception as equivalent to an affidavit of facts, and reduce it to its strict office, viz., as a pleading only; (8) that this indictment was of that character, and hence insufficient as a basis of removal.

2. SAME — SECTION 33, JUDICIARY ACT — "OFFENSES AGAINST THE UNITED STATES" — FEDERAL OFFENSES — LOCAL OFFENSES UNDER LOCAL LAW EXCLUDED.

Removable offenses under section 1014, Rev. St., are the same as under section 33 of the judiciary act; the latter refers only to federal offenses, created by the general legislation of congress, and does not embrace offenses such as libel under the local or common law of the District of Columbia alone; the "offenses against the United States" referred to, are such as are triable in the federal courts; libel is not such an offense; the language of section 33 excludes its application to such local offenses in the District of Columbia; the acts of 1871 and 1874 do not extend the

class of offenses referred to in section 33 and section 1014; and the act of 1871 was not designed to give exceptional privileges to the District of Columbia by authorizing removals to that district for an offense like libel, which does not admit of removal as between any of the states, or any of the federal districts of all the rest of the country. *Held,* therefore, that the application for removal should be denied.

On March 8, 1895, Mr. Dana, editor of the New York Sun, was held by Commissioner Shields in this district, under section 1014 of the United States Revised Statutes, for trial in the District of Columbia upon an indictment there found against him and William Laffan for libel against Frank B. Noyes, a director of the Associated Press, contained in an editorial article printed and published in The Sun of February 22, 1895, and circulated in Washington. The defendant Laffan not having been found, application was made to the district judge for an order removing Mr. Dana to Washington, for trial in the supreme court of the District of Columbia, where the indictment was filed on March 7, 1895.

The complaint before the commissioner was made by the United States attorney for this district, in a brief affidavit, which did not itself charge any offense, but alleged, upon information and belief, the finding of the indictment, as above stated, and that the defendant was in this district. Attached were an authenticated copy of the indictment, and a copy of the bench warrant issued thereon by the chief justice of the court, directing the marshal of the District of Columbia to arrest the defendants if found in that District.

The indictment contained three counts. The first stated that the Sun Printing & Publishing Association was a New York corporation, engaged at the city of New York, in the business of printing and publishing The Sun newspaper daily; that Mr. Dana was its editor, and as such, composed, and procured for publication in The Sun, the editorial articles that appeared in the daily issues thereof; that the defendant Laffan was the manager of the paper, who had charge and superintendence of the printing, publication, and sale thereof; and that as such manager Laffan published and sold, and caused to be sold the issues of the paper in the city of New York, and at other places in the United States, among them, at the city of Washington; and that 300 copies of The Sun were regularly sent to Washington, and were sold by said Laffan as such manager for circulation there, as Mr. Dana well knew; that Mr. Dana, so being editor, and Mr. Laffan, manager, of The Sun, did, at the city of New York, on the 22d of February, 1895, maliciously write and publish, and cause and procure to be written and published in The Sun, in the form of an editorial article, the libelous matter complained of, entitled "The Work of Rascals"; and on the same day maliciously and unlawfully sent and caused to be sent to the city of Washington, for circulation there, 300 copies thereof, containing the libelous matter referred to; and did then and there on February 22, 1895, at the District of Columbia, unlawfully publish, and cause to be published, the libelous matter in the editorial article above referred to.

Two other counts in the indictment are of the same purport substantially, except that they make no reference to the publication of The Sun in New York, or to any acts of the defendants in New York; but aver that the defendants on the 22d day of February, 1895, did, at the said District of Columbia, write and publish, and cause and procure to be written and published a certain other libel, in the same words as stated in the first count. Mr. Dana, on notice of the proceedings, appeared before the commissioner. His identity was proved; and also that he was not in Washington, but in New York, during all the period alleged in the indictment, and had nothing to do with the sale or circulation of the paper; he denied the existence of probable cause, the sufficiency of the papers presented to the commissioner, and offered evidence to show want of probable cause, which was excluded, the commissioner ruling that only the question of identity was before him. The question of removal was elaborately argued before the district judge orally, and upon briefs afterwards submitted.

.Wallace Macfarlane, U. S. Dist. Atty., and Max J. Kohler, Asst. U. S. Dist. Atty., for the United States.

Elihu Root, Franklin Bartlett, and Jere Wilson, for defendants.

BROWN, District Judge (after stating the facts). The indictment charges that the alleged libel was published both in New York and in Washington. But the facts stated in the indictment, and the slight evidence taken before the commissioner, are sufficient to show that whatever Mr. Dana had to do with the publication of The Sun of February 22d, containing the alleged libelous matter, was done in New York. Upon this ground it is contended by his counsel that he cannot be removed to Washington for trial, under the provisions of the United States constitution, which require the trial of offenders to be had in the state and district where the offense shall have been committed. The law of libel, however, authorizes an indictment where the libelous matter has been circulated through the defendant's instrumentality or procurement, and the common-law authorities justify the contention of the prosecution, that if the accused, within one jurisdiction has set agencies in motion for the purpose of procuring the circulation of the libelous matter in another jurisdiction, the offense is committed by him in the latter jurisdiction, though he was not physically present there.

Whether the requirement of the constitution that the trial shall be had where the offense is committed, is to be construed according to the technical common-law rule existing at the time the constitution was adopted, or in the more popular sense of the word "committed," and with reference only to the place where the defendant's own acts were done, is a mooted question, which I do not find it necessary to decide. Some very pertinent remarks on this point adverse to the contention of the prosecution, are to be found in the opinion rendered by Justice James, in the case of U. S. v. Guiteau, 1 Mackay, 544, 545, and also by Justice Hagner, in the same case (pages 553, 554), both of whom express the opinion that the constitutional provision is to be interpreted on grounds "independent of the common law," and with reference only to the "place where the manifest act of the defendant was done"—"where his active agency was employed"—and that it "forbids trial in a district where the ultimate consequence of his act happened, but where he does not act."

The language of courts, however, is to be considered with reference to the facts of the case in hand; and in that case the mortal blow was delivered in the District of Columbia, though the death resulting from it occurred afterwards in New Jersey. Such cases are distinguished from those in which the defendant's acts are direct and continuous, as when a pistol ball is fired across the boundary line of two jurisdictions; in that case, the blow is deemed given and the offense committed where the ball strikes, though the offender was across the line and in another jurisdiction. U. S. v. Davis, 2 Sumn. 482, Fed. Cas. No. 14,932. And so in libel, it is said, the injurious blow is delivered at the place where the circulation or publication is brought about intentionally through the defend-

ant's procurement. If the circulation in a foreign jurisdiction arises only through the independent acts of others, without any active privity or intentional procurement of the defendant, no doubt can arise; as, for instance, in the case of a sale by the publishers of papers at the principal place of publication to a newsdealer in the ordinary course of trade, by whom the papers are forwarded to other jurisdictions in the ordinary course of his business. In such a case the remarks of Judge Cooley would certainly be pertinent:

"The actual offense, if any," he says, "was committed in New York. But a technical publication also took place in Washington by the sale of papers there. * * * It would be a singular result of a revolution where one of the grievances complained of was the assertion of a right to send parties abroad for trial, if it should be found tha' an editor may be seized anywhere in the Union and transported by a federal officer to every territory into which his paper may find its way, to be tried in each in succession, for offenses which consisted in a single act, not actually committed in any of them." Const. Lim. *320, note.

As the facts bearing upon this point appear very imperfectly, through the slight testimony admitted by the commissioner, it will not be useful to consider it further here, though it has an important connection with the sufficiency of the indictment; and in that relation it will be referred to hereafter. It is also unnecessary, as a careful examination of the case in other aspects satisfies me that the application for removal should be denied, (1) because of the insufficiency of this indictment as a basis for removal proceedings under the practice required by section 1014; and (2) because the offense charged, resting wholly on the common law of Maryland, continued in force there by the acts of congress, does not belong to the class of "offenses against the United States" contemplated by section 33 of the judiciary act, or by section 1014 of the Revised Statutes, upon which this application is based.

## (1) Procedure: The Indictment as Evidence:

The commitment was made, and removal is asked, upon no evidence of criminality, or of probable cause, except a copy of the indictment found in the District of Columbia. Its reception as evidence of criminality was objected to. The objection was overruled, and the finding of the indictment was treated as so far conclusive on the question of probable cause, as to leave nothing for the commissioner, as a committing magistrate, to determine, except the identity of the defendant. Evidence offered by the defendant to disprove probable cause was accordingly rejected. On the question of criminality, no witnesses were called for the prosecution, and none was allowed for the defendant. It is claimed by the prosecution that the long practice of this district warrants that course. No reported decision of my predecessors on this point has been cited, and I know of none; nor has the point been before presented to me for decision. As applications for removal upon indictments found in other districts are becoming frequent, correct practice in regard to them is so important that I am constrained to give it careful attention. If the practice pursued in this case is

not warranted by law, no previous acquiescence in it can justify its continuance, when properly challenged; especially in a matter affecting personal liberty. Two points are involved, viz., whether the indictment is admissible at all as a foundation for commitment under section 1014 of the Revised Statutes; and if admissible, its effect and conclusiveness on the question of probable cause. There is not statute of the United States directly determining these questions.

. In the earliest case referring to the subject (1868), and the only one in this circuit (In re Clark, 2 Ben. 540, Fed. Cas. No. 2,797), no question on this point was raised; for Benedict, J., states expressly in the opinion rendered, that the "single issue" presented to him did not include any question "whether the foreign indictment and warrant were sufficient evidence to authorize commitment"; and it was, therefore, not considered. In U. S. v. Jacobi (1871) 4 Am. Law T. 151, Fed. Cas. No. 15,460, Judge Withey states his opinion, "that a certified copy of the indictment would be sufficient not only to justify the United States attorney in making the necessary complaint, but to authorize the issuance of a warrant of arrest (i. e. the first warrant) by the proper officer." But he reiterates what he had said in U. S. v. Shepard, 1 Abb. (U. S.) 434, 435, Fed. Cas. No. 16,273, viz., that there can be no removal summarily under the thirty-third section of the judiciary act, nor until after commitment by the proper officer; and no commitment, until after an examination, and the finding of probable cause. In the Case of Shepard he discharged the defendant because his presence had been procured summarily, upon a warrant based upon an unverified information by the United States attorney.

Judge Lowell, in Re Alexander (1871) 1 Low. 530, Fed. Cas. No. 162, held, that the foreign indictment "being found upon oath and after the examination of witnesses, has a presumption of validity." But "before a committing magistrate," under section 1014, he says, "Such an indictment is only a piece of evidence, which may be met and controlled; but where it stands by itself, and is uncontradicted, it is enough to authorize the warrant." In the case of U. S. v. Pope (1879) 24 Int. Rev. Rec. 29, Fed. Cas. No. 16,069, the subject was again considered by him, and he there says that the allowance of the indictment in evidence "rests rather on long usage than on any principle of law; because, generally speaking, an indictment is evidence of nothing but its own existence, unless there is some statute giving it a greater effect (see Rex v. Eriswell, 3 Term R. 722, per Lord Kenyon); it is but secondary evidence after all, or rather a statement of the result of evidence, and the better practice is to give primary evidence of criminality." The indictment in that case was for conspiracy in Louisiana. Proof was admitted before the commissioner to show that the defendant was not in Louisiana at the time alleged. "The allegations of the date of the conspiracy," says Judge Lowell, "involve the indictment in contradictions, which, if they are errors, must be corrected by evidence, and none is offered. The indictment itself must stand or fall, by its own

dates. * * * It is, therefore, worthless as evidence of a conspiracy, just as an affidavit would be which contained such inconsistencies."

In the case of U. S. v. Rogers, 23 Fed. 658, 661–663, Parker, J., says:

"In the discretion of the judge he may take the indictment as prima facie evidence of jurisdiction"; but if the question of the jurisdiction is raised, (i. e., the place where the offense was committed) the judge, either on application for removal, or on habeas corpus, "may go behind the indictment to ascertain where the trial is to be (i. e. may lawfully be) had"; and upon the additional proofs taken on that point, the defendant was in that case discharged. On the same ground, removal was denied in the cases of In re Buell, 3 Dill. 116, Fed. Cas. No. 2,102; In re Terrell, 51 Fed. 213; and In re Corning, Id. 205,—upon an analysis of the averments of the indictment itself. In the case of In re Wolf, 27 Fed. 606, 608, Parker, J., says:

"If the indictment contains allegations sufficient to show a crime has been committed by the party charged, it is the practice of the federal judges to take the same as a prima facie showing that a crime has been committed at the place alleged by the party charged; and, if nothing else appears, to order a removal of the party charged. But I have no doubt the judge, in his sound discretion, may go into the whole case, if necessary, to enable him to determine whether the party is to be removed from his home to a distant part of the country. This is a law in restraint of liberty, and, like all laws of this character, while the very substance of the law is not to be construed away, yet it is to be strictly construed, and strictly pursued. The government asking a removal is required to fully comply with the law."

The defendant was there also discharged.

In U. S. v. Fowkes, 49 Fed. 50, Butler, J., treated the subject in substantially the same manner; admitting the indictment in evidence, but finding it insufficient, on hearing the defendant's evidence. "The court," he says, "may treat an indictment as sufficient authority for holding the relator, or it may not, as circumstances seem to require." When found at a distance, at the instance of the prosecuting officer, and without any previous commitment, notice, or binding over, and not supported by any further proofs, he regards the grand jury's "finding, as little more than matter of form."

The circuit court of appeals, in affirming this decision (53 Fed. 13, 3 C. C. A. 394), say:

"We do not doubt that a district court may, in its discretion, and in a proper case, order a warrant of removal upon an indictment alone; but it would be going much too far to hold that in all cases * * * the judge is precluded from hearing any other evidence than" the indictment; and the court held that the judge was in that case justified in requiring that he should be satisfied, before he would deprive the relator of his personal liberty and order his transfer to a distant state for trial (Missouri) that there was evidence on which a jury might convict in that state; and that there was no error by the judge in his requiring, after the evidence given by the defendant, "other evidence than the indictment itself, that the court in Missouri had cognizance of the offense; and in discharging the

accused, upon failure of the government to comply with that requirement." The question there was similar to one of the principal questions here, viz., did the defendant commit any offense 'in the District of Columbia where the indictment was found, so as to give the court in that district any cognizance of the offense, or any jurisdiction to try him? In that aspect the indictment is always open to criticism, and contradiction. In re Terrell, 51 Fed. 213; In re Corning, Id. 205, 206.

The above are the only cases I have found in which the effect of the indictment as evidence is considered. According to them, an indictment in another district, though admissible as prima facie evidence, is not conclusive, and cannot shut out evidence for the defendant to show that no offense was committed by him within the district to which removal is sought.

The statutory provisions bearing on the subject, as well as the practice before committing magistrates, though sometimes referred to, have in nearly all the cases cited been so little considered, that it will be useful to recur to them.

The proceedings for commitment and removal are founded solely upon section 1014 of the Revised Statutes. Plainly, therefore, they must conform to the conditions enjoined by that section. Cases like U. S. v. Berry, 4 Fed. 779, and U. S. v. White, 2 Wash. C. C. 29, Fed. Cas. No. 16,685, which did not arise under section 1014, nor involve its application, have little bearing on the question. The proceedings must also conform to the fourth amendment of the constitution, which provides that "no warrant shall issue but upon probable cause, supported by oath or affirmation." Section 1014 is as follows:

"For any crime or offence against the United States the offender may * * * by any justice or judge of the United States, or by any commissioner, etc., or by any judge of the supreme court, etc., * * * justice of the peace, or other magistrate, of any state where he may be found, and agreeably to the usual mode of process against offenders in such state, be arrested and imprisoned or bailed for trial before such court of the United States as by law ["as by this act," says section 33 of the judiciary act] has cognizance of the offence. Copies of the process shall be returned as speedily as may be unto the clerk's office of such court, together with the recognizances of the witnesses for their appearance to testify in the case; and where any offender or witness is committed in any district other than that where the offence is to be tried, it shall be the duty of the judge of the district where such offender or witness is imprisoned, seasonably to issue, and the marshal to execute, a warrant of removal to the district where the trial is to be had."

The whole structure of this section, its provisions in regard to bail, recognizances, witnesses, and commitment, and the express provision that the proceeding shall be "agreeably to the usual mode of process against offenders in such state," show that the familiar common-law proceeding upon complainant for the arrest and commitment of offenders by committing magistrates was intended to be adopted and followed, subject to the provision adopting the procedure of the several states. Even the magistrates named are almost identical with those named in the state statutes.

The proceeding contemplated by section 1014 is, moreover, an original and independent proceeding. It makes no reference to any indictment found elsewhere, nor is there any different provision for

such cases. In those cases, by the common-law practice, and by the state practice, the defendant, if within the state or kingdom, was arrested upon a bench warrant, or a warrant signed by a justice of the peace, issued directly upon the finding of the grand jury. The bench warrant ran throughout the state, or kingdom; a justice's warrant had to be "backed," or indorsed, by a justice in the county where the defendant was found. 1 Chit. Cr. Law, 342; Code Cr. Proc. N. Y. § 304. As congress has not authorized that mode of proceeding upon federal indictments, if the defendant is not within the district where the indictment is found, resort must be had, as it is now considered, to an original proceeding by complaint under section 1014; and whenever that section is appealed to, the procedure required by it must be observed, whether there has been a previous indictment found elsewhere, or not. The requirement that the proceeding shall be "agreeably to the usual mode of process against offenders in such state," "was designed," says Mr. Justice Curtis, in U. S. v. Rundlett, 2 Curt. 41, Fed. Cas. No. 16,208, "to assimilate all the proceedings for holding accused persons * * * to the proceedings had for similar purposes by the laws of the state where the proceedings should take place." The words "mode of process," he says, are synonymous with "mode of proceeding."

This must embrace the preliminary examination usual in the state, including the taking of evidence, depositions, and the examination of witnesses, and the duty of the magistrate in finding probable cause; because, aside from this clause, there is no rule on those subjects; and it cannot have been intended that the proceedings should be conducted arbitrarily, and without any rule at all. The provision also for the commitment of witnesses, contemplates their presence and examination. In making this provision for an observance of the practice in use in the state where the arrest is made, it may be reasonably presumed that the intention of the judiciary act was to prevent the hateful appearance of employing summary and arbitrary methods of removal, and to avoid creating prejudice against the new government which would be likely to be engendered through courses of procedure to which the people of the several states were not accustomed, and against which they had just successfully fought. The construction of treaty stipulations is analogous. In re Farez, 7 Blatchf. 345, 357, Fed. Cas. No. 4,645.

Although the state rules of evidence are not applicable in criminal proceedings in federal cases, unless congress has so provided, the above clause of section 1014 sufficiently shows the intent of congress in this instance. It also imports that the rules of procedure to be followed in proceedings under section 1014 are those in force in the state at the time and place of the removal proceeding. This construction has been adjudged either directly, or by necessary implication in many cases; by Woodruff, J., in U. S. v. Case, 8 Blatchf. 251, Fed. Cas. No. 14,742; by Judge Dillon, in U. S. v. Horton, 2 Dill. 94, Fed. Cas. No. 15,393; by Hammond, J., in U. S. v. Brawner, 7 Fed. 86, 90; by Deady, J., in U. S. v. Martin, 17 Fed. 150, 156; and by Dyer, J., in Re Burkhardt, 33 Fed. 25, 26. It is implied also in Mr. Justice Miller's language in the Case of Bailey, 1 Woolw.

422, 426, Fed. Cas. No. 730, holding that although no examination is provided for in express terms by section 1014, it is necessarily implied in the reference to the state practice. "It would be a waste of time," he says, "to attempt to show that an imprisonment or order for bail is never made in any state, without a previous examination into the probable guilt of the prisoner, unless he voluntarily waives such examination." Hammond, J.; says: "That the preliminary examination is to be in accordance with the usages of the district, seems to be a plain requirement of the statute." Deady, J., referring to the clause in question, says, "The validity, etc., is to be determined by the law of Oregon for the arrest, examination, and commitment of offenders"; and Dyer, J., says that the act "requires a preliminary examination, so that the committing magistrate, and the judge signing the order of removal, may be satisfied of the probable guilt of the accused." I do not find any reported case dissenting from these views. The state practice, therefore, as regards examinations before committing magistrates, must be followed, so far as applicable, in proceedings under section 1014.

At common law a magistrate could not lawfully commit except upon oath. When the witnesses were brought before him, he was required to take their depositions as to the facts and circumstances within their knowledge showing criminality; the defendant at length acquired the right to cross-examine the complainant's witnesses, and to produce witnesses on his own behalf; and on the facts thus ascertained, the magistrate was to determine the question of probable cause. 1 Chit. Cr. Law, 33, 34, 78, 79; 1 Tayl. Ev. § 484, note 2. Provisions to this effect were early incorporated in the statutes of New York, were re-enacted in the Revised Statutes (2 Rev. St. 706), and are all stated in fuller detail in the existing Code of Criminal Procedure, adopted in 1881 (Laws 1881, c. 442; Code Cr. Proc. §§ 148–150, 194, 207, 208). If a magistrate commits upon oath of belief or suspicion only, without any statement of facts and circumstances showing probable guilt, he is liable to an action for false imprisonment. 1 Chit. Cr. Law, 34; Blodgett v. Race, 18 Hun, 132. See In re Rothaker, 11 Abb. N. C. 122.

The construction given to the fourth amendment of the constitution is to the same effect. Chief Justice Marshal, in the Case of Bollman, 4 Cranch, 75, says:

"This probable cause, therefore, ought to be proved by testimony in itself legal, and which, though from the nature of the case must be ex parte, ought in most other respects to be such as a court and jury might hear."

In Re Rule of Court, 3 Woods, 502, Fed. Cas. No. 12,126, Mr. Justice Bradley says:

"It is plain upon this fundamental enunciation * * * that the probable cause referred to, which must be supported by oath or affirmation, must be submitted to the committing magistrate himself, and not merely to an official accuser; so that he, the magistrate, may exercise his own judgment on the sufficiency of the grounds shown for believing the accused person guilty. In other words, the magistrate ought to have before him the oath of the real accuser, presented either in the form of an affidavit, or taken down by himself by personal examination, exhibiting the facts on which the charge is based, and on which the belief or suspicion of guilt is founded. The magistrate can

then judge for himself and not trust to the judgment of another, whether sufficient and probable cause exists for issuing the warrant."

Accordingly, a rule was formally established in that circuit that—

"No warrant of arrest shall be issued by any commissioner upon mere belief or suspicion of the person making such charge; but only upon probable cause, supported by oath or affirmation of such person, in which shall be stated the facts within his own knowledge constituting the grounds for such a belief, or suspicion."

The same rule applies as on informations. U. S. v. Tureaud, 20 Fed. 621; U. S. v. Polite, 35 Fed. 58.

The fundamental requirements, therefore, of the fourth amendment, and of the practice of this state, made applicable by section 1014, are that the facts and circumstances tending to show criminality shall be made to appear to the magistrate on oath, whether upon examination by the magistrate himself, or by affidavit, or deposition; that if the defendant demand an examination, the complainant's witnesses, if within the county, shall be recalled, if desired, for cross-examination, and the defendant allowed witnesses in his own behalf; and that the magistrate must himself find in the facts thus shown sufficient probable cause, independent of the belief of other persons.

There is no express provision either by congress, or by the law of this state, as to the reception or effect of an indictment found in another state or district as evidence before a committing magistrate; though in California a state statute is said to make such an indictment legal evidence. U. S. v. Haskins, 3 Sawy. 262, Fed. Cas. No. 15,322. In New York such a question in the state practice never arises; because after indictment found in one county the offender, if in another county, is removed by a bench warrant, and not by proceedings before a committing magistrate. In proceedings under section 1014 in this state, therefore, a certified copy of a foreign indictment must stand upon the general rules applicable to preliminary examinations; and by these rules it is at best, as stated by Lowell, J., in U. S. v. Pope, supra, but secondary evidence of the facts constituting the offense, and hence in no way conclusive.

Section 905 of the Revised Statutes, as respects the faith and credit to be given to the "records and judicial proceedings of the courts of other states," etc., is not applicable; for the reasons, (1) that a grand jury is not a court (U. S. v. Clark, 1 Gall. 497, Fed. Cas. No. 14,804; Todd v. U. S., 158 U. S. 278, 15 Sup. Ct. 889); (2) that if it were, its proceedings, being ex parte and without notice to the defendant, are in no way binding upon him elsewhere (Pennoyer v. Neff, 95 U. S. 714, 733; Scott v. McNeal, 154 U. S. 34, 46, 50, 14 Sup. Ct. 1108); (3) that the indictment as a record, even in the court where found, is not evidence of anything more than the finding of the grand jury. The warrant against the defendant in that jurisdiction is, indeed, based upon the action and the finding of the grand jury, of which the indictment is evidence; because they are each parts of one constitutional proceeding for bringing the accused to trial; but on the trial there the averments of the indictment are not the least evidence against the accused; nor are they primary legal evidence in any in-

dependent proceedings elsewhere. No one would contend that aside from statute, an indictment in one district or state would be a sufficient basis for an indictment in another state or district in which legal evidence was required. King v. Willett, 6 Term R. 294; Code Cr. Proc. N. Y. § 256.

As the object of every preliminary examination, however, is not to determine finally the question of guilt, but only the existence of probable cause to believe an offense has been committed, more latitude in receiving evidence is allowed than upon a trial. In the Case of Bollman, supra, before Chief Justice Marshall, an affidavit taken in Louisiana stating facts and circumstances within the knowledge of the affiant was accordingly held admissible in Virginia, the witness not being procurable; although from the remark of the chief justice that commitments were made ex parte, it would seem that the state practice there was different from ours; and so in U. S. v. White, 2 Wash. C. C. 29, Fed. Cas. No. 16,685. Under the law of this state ex parte commitments are not allowed, if an examination is demanded. The witnesses are not required to be produced, however, for cross-examination, if they are not within the county; and committing magistrates are not, like a grand jury, limited by statute to strictly legal proof. Code Cr. Proc. N. Y. § 256; King v. Willett, 6 Term R. 294. Under the Criminal Code of this state, it has been held that a complaint upon information and belief is sufficient for issuing the warrant, if the particulars of the information and the informants are also stated. People v. McIntosh (1886) 5 N. Y. Cr. R. 39, and such is the common practice. It would, in many cases, defeat the ends of public justice, and the guilty would often escape before the necessary proof could be procured, if in issuing an order of arrest nothing but strictly legal evidence could be considered by the magistrate. But complaints on information and belief are to be closely scrutinized. Headley, N. Y. Cr. Just. 80–82.

An indictment found in another district, though not primary evidence of the facts stated in it, may, however, be secondary evidence of a more or less persuasive character. It contains the finding of a body specially constituted by law to inquire into offenses; it is required to be based either upon the examination of witnesses, or upon the knowledge of the grand jury itself; it is a record of their presentment or complaint, and purports to be made upon oath, and is delivered to the court upon their oath to make true presentments. Beyond that jurisdiction, it may, therefore, be received as any complaint on information and belief would be received, and its sufficiency should be judged by the same rules. The question of probable cause, the magistrate must himself determine from all the facts ascertained by him. The judgment of a foreign grand jury is not to be a substitute for his own. If the narrative of facts contained in the indictment is clear, consistent, and unambiguous in showing the commission of the offense charged, I think it may be regarded as equivalent to a deposition of the facts ascertained by the grand jury upon the sworn examination of the witnesses whose names are indorsed on it; and as such, sufficient evidence for the issue of the

warrant of arrest, under section 1014, when other evidence of the facts is not conveniently attainable; and hence it is also sufficient for commitment, if examination is waived, or when the averments of the indictment are not contradicted.

But indictments are often of quite a different character. An indictment is not, in fact, prepared, or designed, as an affidavit, or a deposition. It is, in reality, a charge, an accusation, a pleading, designed to put the defendant on trial. Though presumed to embody the material facts proved before the grand jury, it is not necessarily confined to those facts. It is drawn up by the district attorney as a legal accusation. It is not formally verified. The matters stated in it are not necessarily stated as they were proved before the grand jury; they may be pleaded according to their legal effect; i. e., as the district attorney may understand their legal effect. Legal inferences are often stated as facts; facts and law indistinguishably blended; and in the use of different counts for the same actual offense, although by a legal fiction the different counts are supposed to relate to different offenses, the law tolerates such inconsistencies and even contradictions in indictments, as in a deposition would constitute perjury. An indictment that appears on its face to be of this character, cannot be deemed or treated as equivalent to a deposition or an affidavit of facts; because it plainly is not designed to be so treated, and its form and contents forbid it to be so regarded. It must be judged by its statements, altogether; and if taken as a whole, it is contradictory on material points, it becomes worthless as an affidavit of facts, however perfect as a pleading; and such an indictment is, therefore, insufficient as a foundation for removal proceedings.

Such, I think, is the indictment in this case. The main questions involved make it most material to know what acts of each defendant were committed here, and what, if any, in Washington. There is no definiteness or certainty in the essential statements in this regard, as respects Mr. Dana. He denies that any acts of his were done in Washington. The first count alleges that Mr. Dana wrote the libel in New York; the second and third counts allege, on the contrary, that Dana and Laffan wrote, or caused it to be written, in Washington. The indictment in the first count alleges a circulation and publication of the libel in Washington, and also alleges a prior publication of the same libel in New York. It does not distinctly allege any direct agency of Mr. Dana in the circulation in Washington. The averment of publication there by Mr. Dana is evidently a legal conclusion only. It states that Mr. Dana was the editor of the paper; but that Mr. Laffan was the manager, and that Laffan had charge and superintendence of its publication and sale; that Laffan, as manager, sold and caused it to be sold in New York and other places, including Washington; that 300 copies were regularly sold by Laffan for circulation in Washington, and were sent there; but in what place and to whom Laffan sold them, and by whom the 300 copies were sent to Washington, are not definitely stated. The indictment in the same count afterwards alleges that

Mr. Dana and Mr. Laffan sent and caused to be sent to Washington 300 copies for circulation there. All the averments as respects Mr. Dana's agency in the circulation of the paper in Washington are uncertain, and in part contradictory. Its averments might all be true, in the alternative and conjoined way in which they are stated, though the simple fact was that the 300 copies were sold in New York in the usual course of trade to a newsdealer here, who was accustomed to dispose of them in Washington, and sent them there on his own account, in the usual course of business. Such an indictment cannot be treated as equivalent to a complaint on oath; or if so treated it would discredit itself by its inconsistencies and contradictions. A magistrate could not properly act upon an affidavit of that character; and hence it cannot serve as the necessary legal basis for a proceeding under section 1014.

It is, moreover, the duty of a committing magistrate, as above observed, to scrutinize closely a complaint founded on information only, and to require the production of such original evidence as is near at hand and easily procurable, in support of such a complaint. The office of The Sun was but a few hundred feet distant, and original evidence as to the alleged libel and other important averments were easily procurable. The alleged libel consists of a few lines only extracted from an alleged editorial article in The Sun of February 22, 1895. But the article itself was not produced, nor the paper in which it appeared; nor are either of them before me. Non constat, but if produced, they might have turned out to be only fair comments on the result of a judicial investigation. Other original evidence upon material facts was equally easy of production, but was not sought. Under such circumstances, to permit an investigation before a grand jury in a distant place, and such uncertain results of that investigation as are exhibited in this indictment, without the production of any original evidence easily available concerning facts occurring close at hand, to stand as a substitute for an investigation by a committing magistrate on the spot, and as a substitute for the magistrate's judgment on the facts that in such a proceeding would be ordinarily procured, would be to sustain the very practice which section 1014 was designed to prevent, in requiring the investigation to be conducted according to the usages of the state where the proceeding is had.

### (2) Libel not a Removable Offense:

I am equally satisfied that libel in the District of Columbia does not belong to the class of offenses contemplated or provided for by the thirty-third section of the judiciary act, or by section 1014 of the Revised Statutes, which re-enacted it.

The slight change of phraseology in section 1014 (shown in the quotation, supra) does not import any intent to change the meaning or effect of the original act. The verbal change was appropriate in order to avoid the incongruity arising from the wording of section 33, when applied to new states, whose courts, though of the same character as those created by the judiciary act, and within its gen-

eral intent, were not within its letter, because not created "by that act." The change has no other significance. The rule laid down by Spencer, J., in Taylor v. Delancy, Caines' Cas. 149, 151, for constru-ing the revision of statutes, which was adopted by Kent, J., in Yates' Case, 4 Johns. 359, and which has since been so generally followed, is applicable here, viz.: "That mere change of phraseology shall not be deemed or construed a change of the law, unless such phrase-ology evidently purports an intention in the legislature to work a change."

Mr. Justice Miller, in U. S. v. Bowen, 100 U. S. 508, 513, says: "This principle is undoubtedly sound." In Murdock v. City of Mem-phis, 20 Wall. 617, he says the revision of the United States statutes was "based on the idea that no change in the existing law should be made"; and in Smythe v. Fiske, 23 Wall. 382, Mr. Justice Swayne says: "It was the declared purpose of congress to collate all the statutes as they were at that date, and not to make any change in their provisions." See, also, U. S. v. Lacher, 134 U. S. 626, 627, 10 Sup. Ct. 625; U. S. v. Hirsch, 100 U. S. 35.

In The L. W. Eaton, 9 Ben. 289, 301, 302, Fed. Cas. No. 8,612, Blatchford, J., says that "the presumption is that new language is the result simply of revision, simplification, rearrangement and con-solidation, with a view to re-enactment of the same substance and meaning"; unless the words clearly indicate a different intent. If, therefore, up to the time of the revision of 1874, section 33 of the judiciary act did not authorize removals for libel to the District of Columbia, it cannot be seriously contended that section 1014 of the Revised Statutes warrants such removals now.

It is plain, however, that the judiciary act did not contemplate any such local offenses as libel in the District of Columbia. In the federal system, there are no common-law crimes. It was early ad-judged in the case of U. S. v. Hudson, 7 Cranch. 32, that even libel against the government, or its officers, could not be punished crim-inally, without a statute therefor. Mr. Justice Johnson says:

"The legislative authority of the Union must first make an act a crime, affix a punishment and declare the court that shall have jurisdiction of the offense." U. S. v. Coolidge, 1 Wheat. 415; U. S. v. Britton, 108 U. S. 206, 2 Sup. Ct. 531; Benson v. McMahon, 127 U. S. 457, 466, 8 Sup. Ct. 1240; Manchester v. Massachusetts, 139 U. S. 262, 11 Sup. Ct. 559; U. S. v. Eaton, 144 U. S. 677, 687, 12 Sup. Ct. 764; In re Greene, 52 Fed. 111.

There has never been any statute either of the United States or of the state of Maryland, making libel a criminal offense, or defin-ing its punishment. The present indictment rests wholly upon the old common law of Maryland, and upon the act of congress of Feb-ruary 27, 1801 (2 Stat. 104). accepting the cession of that district, and providing that "the laws of Maryland as they now exist shall be and continue in force," except as modified, etc.

Assuming, though that point also is disputed, that libel in the Dis-trict of Columbia is a criminal offense, it is nevertheless a purely local offense. It is no part of the federal system of laws, nor related to the general legislation of congress. In administering the local law of the District of Columbia, the national government there acts as

the state governments act within their several limits in administering the ordinary rights of person and property. That is an exceptional and a wholly different field of action from what is embraced in ordinary federal legislation; and it was evidently wholly foreign to the scope of the judiciary act. Offenses against the local law of the District of Columbia are, in a sense, offenses against the United States, because the United States is the local governing authority. Metropolitan R. Co. v. District of Columbia, 132 U. S. 9, 10 Sup. Ct. 19. But the judiciary act was not dealing with, or contemplating this exceptional and local relation. The District of Columbia had then no existence. The scope and aim of the judiciary act were manifestly purely federal and national. It created the federal courts authorized by the constitution for the country at large; it defined their jurisdiction, civil and criminal; and it established the districts in which each might act. As an incident to that distribution of federal jurisdiction, and to enable federal offenses to be tried in the proper district, it provided by section 33 that for offenses against the United States, offenders found in other districts might be committed and removed to the proper district for trial. What offenses are referred to? Manifestly those federal offenses only of which the courts thereby created had jurisdiction; offenses which those courts were designed to try, and could try; since the only subject of consideration was the national, federal courts, and trials in those courts alone. Those offenses were federal offenses arising under federal statutes applicable throughout the country.

The first of these statutes, known as the "Crimes Act" (1 Stat. p. 112, c. 9), was passed soon after the judiciary act. It defined as "crimes against the United States" (when committed within its exclusive jurisdiction), treason, murder, manslaughter, forgery, larceny, perjury, bribery, etc. Later statutes have added many other offenses. These statutes cover the whole field of the federal criminal law, and all the offenses triable by the federal courts in the different federal judicial districts of the country; and these alone are the offenses contemplated and referred to in the thirty-third section of the judiciary act.

At that time a territorial government and territorial courts had been organized under the ordinance of 1787 in the Northwest Territory. But no one would contend that mere local offenses committed in that territory, and not embraced in any general legislation of congress, were removable "offenses" under the judiciary act, any more than that its territorial courts were "courts of the United States" in the sense of the judiciary act, or of ordinary legislation. When the District of Columbia was afterwards acquired, its courts and local offenses under the local law alone, were in the same category as those of the territories. That none of those courts were "courts of the United States," in the sense of ordinary legislation, has been long adjudicated, because they do not belong to the federal system, and are not courts of the constitution, nor created under the judicial power, but under a separate authority in the constitution to make "all needful rules and regulations for the territories" (article 4, §

3), and to "exercise exclusive legislation over the seat of government" (article 1, § 8). Insurance Co. v. Canter, 1 Pet. 511, 546; Clinton v. Englebrecht, 13 Wall. 447; Hornbuckle v. Toombs, 18 Wall. 648, 655; McAllister v. U. S., 141 U. S. 182–184, 11 Sup. Ct. 949. There is the same distinction between local and federal offenses.

That offenses under the local law of the District of Columbia are not embraced in section 33, also results necessarily from its particular provisions. The commitment and removal are by that section required to be (1) to the proper "district," i. e., to one of the federal judicial districts; and the District of Columbia is not such a district (U. S. v. Guiteau, 1 Mackay, 564); (2) for trial in a "court of the United States," which (3) has cognizance of the offense by virtue of "that act"; and the courts of the District of Columbia, as above stated, are neither "courts of the United States" in the sense of the judiciary act, nor do they derive their authority from the judiciary act.

While each of these three conditions would exclude mere local offenses in the District of Columbia from the removable class, it is important to note still further, that the same conditions, and particularly the provision that the trial must be had by one of the courts established "by that act," show by irresistible inference that the offenses contemplated and intended by section 33 are such offenses only as could be tried in the federal courts established by that act. But libel, either against the government or against private persons, is not and never has been a criminal offense anywhere triable in the federal courts of the country. U. S. v. Hudson, 65 Fed. 68. Section 33 in all its parts is, in fact, wholly inapplicable to offenses under the mere local law of the District of Columbia; and in no contested case reported do I find that any removal to that district has been had for libel, or for any other merely local offense. In the Case of Buell, 3 Dill. 116, Fed. Cas. No. 2,102, the objections here considered were not brought to the attention of the court.

For these reasons, I have no doubt that libel in the District of Columbia was never a removable offense under section 33 of the judiciary act alone.

The only additional acts of congress bearing on the question, are those of 1871 and 1874. The act of 1871 (16 Stat. 426), now section 93 of the Revised Statutes of the District of Columbia, is as follows:

"Sec. 93. The constitution and all the laws of the United States, which are not locally inapplicable, shall have the same force and effect within the District of Columbia as elsewhere within the United States."

The act of June 22, 1874 (1 Supp. Rev. St. p. 38) was passed on the same day the United States Revised Statutes were adopted, and in section 2 declares that "the provisions of the thirty-third section of the judiciary act shall apply to courts created by act of congress in the District of Columbia."

The statute last cited is so vague that it is difficult to determine its intention or effect. It is more noticeable for what it omits than for what it contains. It does not make the District of Columbia a federal district; nor declare that offenders may be removed

thither in like manner as to other federal districts, nor removed thither for violations of the local law; nor does it purport to enlarge the class of offenses contemplated by section 33. It is, therefore, immaterial here. It does not even make the provisions of section 33 applicable in general to the District; but only to "courts created by congress in the District of Columbia." No one court is specified. It extends, therefore, to all the courts, from the highest to the lowest. What provisions of section 33 can be made applicable to all the courts of the District of Columbia? Apparently, those only by which all the judges and magistrates of the courts in the several states are authorized to act as committing magistrates. This, I think, is its only effect, and it has been so held by Treat, J. See In re Buell, 3 Dill. 116, Fed. Cas. No. 2,102.

Such also was the construction given to the act of 1874 by the judiciary committee of the senate, upon a special resolution of inquiry referred to that committee on the 15th of December, 1874, less than six months after the act was passed, and directing the committee to inquire as to the extent and meaning of that act, and particularly, "whether under or by its provisions persons charged with or indicted for libel, or other crime, in said District of Columbia, can be brought from a state or other place within federal jurisdiction, to said District to answer therefor; and also whether said act has any application to prosecution or indictment for the crime of libel in any case, and report thereon."

On the following 16th of February, 1875, the judiciary committee made its report (No. 658). It considers at some length and analyzes the provision of the thirty-third section of the judiciary act, and concludes as follows:

"The sum of the matter, therefore, is, that the second section of the act of June 22, 1874, confers upon the courts of the District of Columbia the power to arrest offenders found in the District who are charged with crime committed within the District, and hold them for trial, (which was the law before,) and to arrest offenders found in the District who have committed crimes against the United States in some judicial district of the United States, and to send them to such district for trial. And that is all. No person can be brought into the District of Columbia under it, either for libel, or any other crime. The committee are of opinion that both the sections of the act are necessary and proper, and in perfect accordance with the principles of justice and the course of civilized jurisprudence. Without provisions of this character the District of Columbia would be an asylum for offenders committing crimes against the laws of the United States and escaping hither.

"It also remains to report, as directed by the resolution of the senate, 'whether said act has any application to prosecution or indictment for the crime of libel in any case.'

"We are of opinion that, as before stated, no person charged with the crime of libel can be brought into the District of Columbia under it, for no person can be brought here under it, for any crime whatever. * * *

"The result is that the act of June 22, 1874, is not, in our opinion, obnoxious to any criticism; and, in respect of the crime of libel, it confers no power either to bring a person charged with it into the District of Columbia or to send him out of it."

The report was signed by Senators Edmunds, Conkling, Freelinghuysen, Wright, Thurman, and Stevenson.

Upon this report no further action was taken, nor any further legislation proposed. So high is the character of that committee,

that nothing short of express legislation or adjudication by the courts, could be weightier as contemporaneous construction. Though not literally, yet substantially, their report covers the whole ground of removability to the District of Columbia for mere local offenses; and as the legal status reported by that committee was acquiesced in, the necessary inference, considering the specific nature of the inquiry is, that the existing status as reported by the committee was satisfactory, and in accord with the legislative intent.

Another inference warranted by the passage of the act of 1874 on the same day the Revised Statutes was enacted is, that section 1014 of the Revised Statutes was not intended or understood by congress to apply to the District of Columbia, nor any new legislation intended by the slight change of phrase in the revision of that section; because if section 1014, as revised, or the original section 33, already embraced the District of Columbia, or applied to it, the act of 1874 would have been wholly superfluous. And it follows further, that the act of 1874 must be deemed to be intended to express just how far section 33 of the judiciary act was designed by congress to be extended to the District of Columbia; viz., to its "courts" alone, i. e., for the purposes above stated, and no further; thus excluding any construction of section 1014 as new legislation for that district. Had the intent of the act of 1874 been to authorize removals for local offenses in the District of Columbia for trial there by its local courts, the act would naturally have said so; or else would have declared section 1014 to be applicable generally to the District of Columbia, to its courts, and to offenses there committed.

The act of 1871, above quoted, adds nothing to the case of the prosecution, but rather makes against it; for not only is it doubtful to what extent the language of section 33 and of section 1014 may be made "locally applicable" to the District of Columbia, but the general intent of the act of 1871 was evidently to do nothing more than to place the District of Columbia, so far as practicable, on an equality of privilege with the various states and judicial districts of the rest of the country. The "force and effect" of the "laws" referred to are, as the act of 1871 says, to be "the same in the District of Columbia as elsewhere within the United States." This act, if applicable (as to which I would not intimate any opinion) would, therefore, extend section 33 to removals for federal offenses alone, (see Hovey v. Elliott, 145 N. Y. 126, 139, 39 N. E. 841) since that is the limit of its "force and effect elsewhere"; and libel is not a federal offense.

Plainly the act of 1871 was not designed to create peculiar privileges in the District of Columbia, nor to impose exceptional burdens on all the rest of the country. Yet that is the precise aim of this application, and that would be the precise effect of granting it. For as between all the states and all the federal districts in the country, there could be no removal in a case like the present. No federal court has jurisdiction to try the offense here charged; and as between the states there is no extradition, (under

other provisions of the constitution and other acts of congress) except of fugitives from justice. This defendant is not a fugitive; he has not fled from the District of Columbia. He was not there; and there is no such thing as constructive flight.

If the acts of 1871 and 1874, above cited, were sufficient to extend section 33 to the District of Columbia (as to which I express no opinion), then removals to that district under section 1014 may now be had for all federal offenses committed there, "the same as elsewhere within the United States"; i. e., for all offenses created under the general legislation of congress, which embraces all the crimes for which removals may be had as between the different federal judicial districts of the country. That is the full scope of section 1014 and section 33. Beyond this, that is to say, in the cases of merely local offenses, which stand on the same level as ordinary offenses in the several states, if the existing laws in regard to interstate extradition passed in pursuance of a separate clause of the constitution, are not "locally applicable" to the District of Columbia under the act of 1871, so as to give a right of removal to that district in accordance with, or in analogy to, the mode of procedure in interstate extradition, the remedy is with congress, if, indeed, congress desires to change the existing conditions; and the report of the senate judiciary committee above cited is sufficient evidence to show that congress has not been under any misapprehension as to what the existing legal status of local offenses in the District of Columbia is, as respects the right of removal. Meantime, it is not for this court to anticipate or presume upon the intent of congress on that subject; or to attempt to supply any supposed defects in the statutes by wrenching them from the true meaning and intent with which they were enacted; least of all when doing so would introduce a new class of removals in favor of the District of Columbia alone, while similar removals are denied, under the constitution and laws, to every other district and state in the country.

Without reference, therefore, to other important points discussed by counsel, the application is denied, on the above grounds, and the defendant discharged.