**NATIVE VILLAGE OF STEVENS, Appellant,**

v.

**ALASKA MANAGEMENT & PLANNING, Appellee.**

No. S–1345.

Supreme Court of Alaska.

May 20, 1988.

Rehearing Denied Aug. 24, 1988.

Michael J. Walleri, Tanana Chiefs Conference, Inc., Fairbanks, for appellant.

Edward A. Merdes, Fairbanks, for appellee.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

MATTHEWS, Justice.

This case arises out of a contract dispute between the Native Village of Stevens (Stevens Village) and Alaska Management & Planning (AMP). A jury returned a verdict for AMP, finding that Stevens Village had

breached the contract. On appeal, Stevens Village raises three grounds on which it believes the verdict should be set aside. First, it claims that this suit is barred by the doctrine of sovereign immunity. Second, it contends that the contract violated government procurement regulations and was therefore unenforceable. Finally, it contends that the contract was a personal service contract containing no definite term of duration and was therefore terminable at the will of either party. We conclude that Stevens Village does not have sovereign immunity. We further conclude that the second ground Stevens Village raises is meritorious. However, AMP is nonetheless entitled to a *quantum meruit* recovery. Because we find the contract unenforceable we do not reach the third ground raised by Stevens Village. We therefore reverse and remand for a retrial on the issue of damages.

## I. STATEMENT OF THE CASE

### A. *Statement of Facts*

Stevens Village is an Alaska Native village organized under the Indian Reorganization Act (IRA), 25 U.S.C. §§ 461 *et seq.* (1982), located on the Yukon River in Interior Alaska. In 1982, Stevens Village received a federal Department of Housing and Urban Development (HUD) grant for $369,000 to be used to bring electricity to the village. The Tanana Chiefs Conference, Inc.[1] (TCC) assisted Stevens Village in obtaining the HUD grant and hiring an engineering and management firm (Marks Engineering) to manage the electrification project.

AMP is a joint venture specializing in Alaskan bush village and community development projects. AMP is owned and operated by David Slaby and James Nims. On March 31, 1983, Stevens Village entered into a contract with AMP pursuant to which AMP would perform "planning and management services, and be established as Architect and Engineer of record for the community of Stevens Village." AMP was also to provide such services as grant writ-

ing, construction administration, budgeting, and construction progress evaluation. In May, 1983, the parties amended the agreement. AMP agreed to provide construction administration, expediting, engineering, and construction services on the electrification project in place of Marks Engineering. Under the original contract, AMP was to be compensated at seven percent of construction costs plus five percent of total costs for financial management services. Under the amendment to the agreement, relating solely to the electrification project, AMP was to receive $35 per hour plus expenses.

By letter dated December 2, 1983, Stevens Village terminated the contract with AMP. Stevens Village claims that HUD and the state had found problems with the electrification project's administration and the Village's relationship to AMP. Stevens Village also asserts that AMP failed to provide a status report requested by state officials and that it fired AMP for failing to perform its contractual obligations. AMP, on the other hand, claims that it was fired because Stevens Village learned it could get the same services free from TCC or the federal Public Health Service.

### B. *Procedural Background*

AMP brought suit against Stevens Village for breach of contract. Stevens Village moved to dismiss on the ground that the suit was barred by the doctrine of sovereign immunity. The trial court denied this motion, concluding that the sovereign immunity defense did not exist on the facts of this case and that, in any event, any immunity had been waived. The court granted AMP's motion for partial summary judgment, finding that a valid contract existed between the parties. It also denied Stevens Village's cross-motion for partial summary judgment, rejecting the argument that because the agreement was one for personal services which contained no definite period of duration, it was either missing an essential term so that no con-

---

1. The Tanana Chiefs Conference, Inc. is a non-profit corporation formed to assist village cor- porations with respect to government contracts and grants.

tract was formed or it was terminable at the will of either party.

Stevens Village's petition to this court for review of the above rulings was denied.

Stevens Village later moved to dismiss AMP's claim on the ground that the contract was unenforceable because it was in violation of federal and state procurement regulations. The trial court denied this motion as well.

After trial, the jury returned a verdict for AMP, awarding it $38,891.00.

## II. DISCUSSION

### A. *This Suit is not Barred by the Doctrine of Sovereign Immunity*

#### 1. Summary

American Indian tribes outside of Alaska have long been recognized as sovereign governmental entities immune from suit. *See, e.g., Three Affiliated Tribes v. Wold Engineering,* 476 U.S. 877, 891–92, 106 S.Ct. 2305, 2313–14, 90 L.Ed.2d 881, 894 (1986); *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 58, 98 S.Ct. 1670, 1677, 56 L.Ed.2d 106, 115 (1978); *United States v. United States Fidelity & Guar. Co.,* 309 U.S. 506, 512–13, 60 S.Ct. 653, 656, 84 L.Ed. 894, 898–99 (1940).

The United States Supreme Court Court has reemphasized the importance of the doctrine:

> The common law sovereign immunity possessed by the Tribe is a necessary corollary to Indian sovereignty and self-governance. See, e.g., *Santa Clara Pueblo v. Martinez,* 436 US 49, 56 L Ed 2d 106, 98 S Ct 1670 (1978). Of course, because of the particular "quasi-sovereign" status of the Indian tribes, the Tribe's immunity is not congruent with that which the Federal Government, or the States, enjoy. *United States v. United States Fidelity & Guaranty Co.,* 309 US 506, 513, 84 L Ed 894, 60 S Ct 653 [656] (1940). Cf. also *McClananhan v. Arizona State Tax Comm'n,* supra [411 U.S. 164] 173, 36 L Ed 2d 129, 93 S Ct 1257 [1263]. And this aspect of tribal sovereignty, like all others, is subject to plenary federal control and definition.

> See *Santa Clara Pueblo v. Martinez,* supra, [436 U.S.] at 58, 56 L Ed 2d 106, 98 S Ct 1670 [at 1676]. Nonetheless, in the absence of federal authorization, tribal immunity, like all aspects of tribal sovereignty, is privileged from diminution by the States.

*Three Affiliated Tribes v. Wold Engineering,* 476 U.S. 877, 890–91, 106 S.Ct. 2305, 2313, 90 L.Ed.2d 881, 894 (1986).

■ We conclude that Stevens Village does not have sovereign immunity because it, like most native groups in Alaska, is not self-governing or in any meaningful sense sovereign. This conclusion is supported by the decisions of this court, *Atkinson v. Haldane,* 569 P.2d 151 (Alaska 1977) and *Metlakatla Indian Community, Annette Island Reservation v. Egan,* 362 P.2d 901 (Alaska 1961). Further, the history of the relationship between the federal government and Alaska Natives up to the passage of the Alaska Indian Reorganization Act, 49 Stat. 1250 (1936) indicates that Congress intended that most Alaska Native groups not be treated as sovereigns. Finally, neither the Alaska Indian Reorganization Act, nor subsequent Congressional acts have signaled a change from non-sovereign to sovereign status.

#### 2. Alaska Supreme Court Cases

We addressed the question of sovereign immunity in *Atkinson v. Haldane,* 569 P.2d 151 (Alaska 1977). We noted that:

> the tribal sovereignty of Indians was first recognized in *Worcester v. Georgia,* 31 U.S. (6 Pet.) 515, 557, 8 L.Ed. 483, 499 (1832), in which Chief Justice Marshall stated that the Indian nations were distinct political communities, having territorial boundaries, within which their authority is exclusive, and having a right to all the lands within those boundaries, which is not only acknowledged, but guaranteed by the United States.

569 P.2d at 157. After a review of many authorities, we concluded that judicial recognition of tribal sovereign immunity turned on whether Congress, or the executive branch of the federal government, had

recognized the particular group in question as a tribe. 569 P.2d at 161–63.

In *Atkinson* we held that the Metlakatlans, located on the Annette Island Reservation, possessed tribal sovereign immunity. We noted that "[t]he interactions of the United States government and the Alaska Native peoples as a whole have been much different from those between the government and the tribes in the other states." *Id.* at 154. We observed that a general reservation system was never developed in Alaska and the federal government never attempted to enter into treaties with Alaska Natives. *Id.* However, we stated that the Metlakatlans were "an exception to the exception," *id.*, in that Congress had set up a reservation for them.[2] "The Metlakatlans' reservation status sets them apart from other Alaska Natives, making them much more like the tribes of the other states." *Id.* at 154–55 (footnote omitted). Further, we noted that the Metlakatlans have "a strong central tribal organization unlike most Alaska Native groups." *Id.* at 155. We noted that in general, "[t]he Native villages and communities of Alaska were not organized on 'tribal' lines, and the village rather than the ethnological tribe has been the central unit of organization." *Id.* at 155 n. 12.

We concluded our historical discussion in *Atkinson* as follows:

Thus, based on the foregoing, we conclude that the reservation status of the Metlakatla Indian Community sets them apart from other Alaska Natives and that the status of the Metlakatla Indian Community has always more closely re-sembled the status of the tribes in other states than the status of other Natives in Alaska. 569 P.2d at 156. Our emphasis on the differences between the Metlakatlans and the other Alaska Native groups suggests that other Alaska Native groups would not be afforded sovereign immunity.

In *Metlakatla Indian Community, Annette Island Reserve v. Egan,* 362 P.2d 901 (Alaska 1961), *rev'd in part,* 369 U.S. 45, 82 S.Ct. 552, 7 L.Ed.2d 562 (1962), we had occasion to review in detail the historical relationship between the federal government and Alaska Natives. The issue in *Metlakatla* was whether regulations issued by the Secretary of the Interior authorizing fish traps operated by the Indian communities of Metlakatla, Kake, and Angoon were valid. Alaska state law prohibited fish traps. We held that the Secretarial regulations were invalid as to all three communities.[3]

Our opinion made the following points which are germane to the present case. "The United States has never entered into any treaty or similar type agreement with any group of Indians in Alaska." *Id.* at 917. "None of the Indians of appellant communities have ever been exempt from taxation by the Territory or State of Alaska." *Id.* at 919. "Crimes committed by Indians in Alaska have always been punished by the territorial and state courts." *Id.* at 920. "There is not now and never has been an area of Alaska recognized as Indian country with one possible exception." *Id.*[4] "There are not now and never have been tribes of Indians in Alaska as

---

**2.** The history of the Metlakatla Indian Community is unique. The Community was established when approximately 800 Tsimshian Indians migrated from British Columbia to the Territory of Alaska in 1887. For a detailed discussion of this history *see Atkinson v. Haldane,* 569 P.2d 151, 153–54 (Alaska 1977).

**3.** On appeal, the United States Supreme Court reversed our decision as to the community of Metlakatla, *Metlakatla Indian Community, Annette Island Reserves v. Egan,* 369 U.S. 45, 82 S.Ct. 552, 7 L.Ed.2d 562 (1962), and affirmed our decision as to the communities of Kake and Angoon, *Organized Village of Kake v. Egan,* 369 U.S. 60, 82 S.Ct. 562, 7 L.Ed.2d 573 (1962). The Secretarial power in Metlakatla was grounded

on an 1891 act of Congress setting apart a reservation for the Metlakatlans, including waters surrounding the land reservation. The 1891 statute empowered the Secretary to govern the use of the Reservation by the Metlakatlans "under such rules and regulations as he might from time to time prescribe." 369 U.S. at 48, 82 S.Ct. at 555, 7 L.Ed.2d at 566. This authority was unique to Metlakatla. Thus, the Secretary's regulations were authorized as to Metlakatla, but not as to the native villages of Kake and Angoon.

**4.** The exception noted by the *Metlakatla* court was the Moquawkie reserve recognized in *Petition of McCord,* 151 F.Supp. 132 (D.Alaska, 1957). The United States District Court for the

that term is used in federal Indian law." *Id.* at 917–18. "No Indian tribe, independent nation or power has been recognized in Alaska." *Id.* at 920.[5]

As noted, *Metlakatla* was reversed by the Supreme Court as to the community of Metlakatla and affirmed as to the communities of Kake and Angoon. Thus, the statement in *Metlakatla* that no tribes have been recognized in Alaska was inaccurate because the Metlakatlans have received Congressional recognition. In all other respects, however, the legal conclusions in *Metlakatla* are accurate.[6]

---

District of Alaska, in an unpublished oral decision, *Native Village of Tyonek v. Puckett,* 82–369 Civil (Transcript of Oral Decision, December 3, 1986), has concluded that the Village of Tyonek located on the former Moquawkie Reserve has sovereign immunity, "based on Tyonek's history and the manner in which the federal government has dealt with Tyonek." *Id.* at 20. The history of Tyonek is unique among Alaska villages, as recognized in *Petition of McCord,* 151 F.Supp. at 136, because Tyonek occupied an Executive Order Reservation at the time it adopted a constitution and by-laws under the Alaska Indian Reorganization Act, 49 Stat. 1250 (1936). *Village of Tyonek,* 82–369 Civil (Transcript) at 5.

**5.** The *Metlakatla* opinion summed up its historical review as follows:

> The broad policy of the United States in its control of federal-Indian relations, as outlined by the United States in its brief, was first to reserve areas for the use of the Indians, to the complete exclusion of whites and of state law. This policy later provided for modified amalgamation with the white population by the allotment process and permissive application of state law to a limited degree, subject always to federal controls for the protection of the Indians. But this is not the history of federal-Indian relations in Alaska. The application of such a policy has never been necessary. Amalgamation has occurred peacefully and naturally. Adaptation to the white man's civilization has been willing and quick and in direct contrast to that made by many tribes in other parts of the United States. We do not mean to imply that the United States has not assisted in the process, for it has. In the fields of health and education, and economically in many instances, it has rendered and continues to render humane and valuable assistance to the natives of Alaska. What we do say is that most of the facts which created the Indian law authority relied on by appellants are absent from this case.

*Metlakatla,* 362 P.2d at 920–21.

**6.** The Supreme Court of the United States in *Metlakatla Indian Community, Annette Islands Reserve v. Egan,* 369 U.S. 45, 50–53, 82 S.Ct. 552, 557–58, 7 L.Ed.2d 562, 567–68 (1962), expressed some of the same views:

> The Indians of southeastern Alaska, who have very substantially adopted and been adopted by the white man's civilization, were never in the hostile and isolated position of many tribes in other States. As early as 1886 a federal judge, holding Alaska Indians subject to the Thirteenth Amendment, denied that the principle of Indian national sovereignty enunciated in *Worcester v Georgia* (US) 6 Pet 515, 8 L ed 483, applied to them. *Re Sah Quah,* 31 F. 327 (D Alaska [1886]). There were no Indian wars in Alaska, although on at least one occasion, see Gruening, The State of Alaska (1954), pp. 36–37, there were fears of an uprising. There was never an attempt in Alaska to isolate Indians on reservations. Very few were ever created, and the purpose of those, in contrast to many in other States, was not to confine the Indians for the protection of the white settlers but to safeguard the Indians against exploitation. Alaskan Indians are now voting citizens, some of whom occupy prominent public office in the state government. *See United States v. Booth,* 161 F Supp. 269 (D Alaska 1958); *United States v. Libby, McNeil & Libby,* 107 F.Supp. 697, 699 (D Alaska 1952). Metlakatlans, the State tells us, have always paid state taxes, in contrast to the practice described and prescribed for other reservations in The Kansas Indians (*Blue Jacket v. Johnson County*) (US) 5 Wall 737, 18 L Ed 667, and it has always been assumed that the reservation is subject to state laws. *United States v. Booth,* supra (161 F Supp. at 270). Congress in 1936, 49 Stat 1250, 48 USC § 358a, by authorizing the Secretary of the Interior to create Indian reservations of land reserved for Indian uses under 48 USC § 358, seems to have believed that Metlakatla was no ordinary reservation, since Metlakatla alone is covered in § 358. Finally, in *United States v. Booth* (F) supra, the District Court for Alaska held that a crime committed on the Metlakatla Reserve, before the extension of jurisdiction over Indian country to Alaska, [citation omitted] was punishable under territorial laws, since for the reasons here outlined the Reserve was not "Indian country" within the meaning of 18 USC §§ 1151–1153.

3. The history of the relationship between the United States Government and Alaska Natives, until the passage of the Alaska Indian Reorganization Act in 1936, indicates that Congress intended that most Alaska Native groups not be treated as sovereigns.

Federal–Native relationships were examined in detail by a task force appointed to study the subject by the Governor of Alaska. The task force issued a report of impressive scholarship.[7] The conclusion of the Report, for the period from the Alaska purchase until passage of the Alaska Indian Reorganization Act,[8] is as follows:

> The language of federal statutes applicable to Alaska, their interpretation by the Courts and their administration and enforcement by the army, the navy, the Secretary of the Interior, and the territorial legislature, and the contemporaneous views of the most knowledgeable Native then living in Alaska indicate that between 1867 and 1936 Congress intended Alaska Natives to be subject to federal and territorial laws generally applicable to all Alaska residents.

Report, *supra*, note 7, at 100 (footnote omitted).

The events set out in the report which support the conclusion that Congress intended that Alaska Native groups not be treated as sovereign include the following.

*First.* Soon after the Treaty of Cession, the United States District Court concluded that Alaska was not "Indian country" and thus the Indian Intercourse Act of 1834 did not apply in Alaska. *United States v. Seveloff,* 1 Alaska Fed. 64 (D.Ore.1872). The court concluded:

> If Congress should think it desirable that this or any other provision of the Indian Intercourse Act should be in force in Alaska, it can so provide. . . .

In 1873, Congress responded to the *Seveloff* decision in a limited fashion. It extended only the sections of the Intercourse Act[9] dealing with alcohol control. This implies that Congress did not intend the comprehensive protection which the Act was meant to afford to Indians to apply in Alaska.

That was the holding of *Waters v. Campbell,* 1 Alaska Fed. 91 (D.Ore.1876), where the section of the Indian Intercourse Act requiring white traders doing business in Indian country to obtain a federal license was found not to apply in Alaska. Similarly, the court stated in *Kie v. United States,* 1 Alaska Fed. 125 (D.Ore.1886) with respect to the 1873 amendment: "[t]his legislation, in my judgment, by at least a reasonable, if not a necessary, implication, is equivalent to a declaration that Alaska is not to be considered 'Indian country,' . . . ." And in *In re Sah Quah,* 31 F. 327, 328 (D.Alaska 1886), the court stated regarding the amendment: "The presumption is clear that by singling out, mentioning, and extending two sections only, the intention was to withhold or exclude from the territory all the other sections of the act."

*Second.* In 1884, Congress enacted the Alaska Organic Act, establishing for the first time a civil government for the District of Alaska. 23 Stat. 24 (1884). The Organic Act, with unusual economy, enacted an entire criminal and civil code for Alaska by adopting the laws of Oregon.[10] The Report notes:

> Nothing in the language of the 1884 Act or its legislative history indicates that Congress intended any area of Alaska to be Indian country or that Alaska Natives in Native villages would not be subject to the civil and criminal laws of Oregon to

---

7. Report of the Governor's Task Force on Federal–State–Tribal Relations (Feb. 14, 1986) (hereinafter Report).

8. 25 U.S.C. § 473a (1982), 49 Stat. 1250 (1936).

9. 17 Stat. 485–530 (1873); Report, *supra* note 7, at 73.

10. Section 7 of the Act provided: "That the general laws of the State of Oregon now in force are hereby declared to be the law in said district, so far as the same may be applicable and not in conflict with the provisions of this Act or the laws of the United States. . . ."

the same extent as the white residents of the District.

Report, *supra* note 7, at 77.

Alaska Natives were held subject to the general civil and criminal laws of Oregon under the Organic Act, even though Alaska's second governor recommended in his report to Congress that the Act be amended so that Natives would be exempt from its provisions.[11] In *Kie v. United States*, 1 Alaska Fed. 125 (1886), a Tlingit Indian who had killed his wife in a Tlingit village was held properly subject to prosecution under a provision of the Oregon Criminal Code which was applicable in Alaska rather than under the Federal Indian Major Crimes Act, 23 Stat. 362 (1885) which was applicable to homicides committed by one Indian against another Indian in Indian country.

In *In re Sah Quah*, 31 F. 327 (1886), a person who was a slave under Tlingit custom filed a habeas corpus petition alleging that his subjugation was illegal. His Tlingit master argued: "[T]hat Alaska is Indian country, and that they as inhabitants are subject to no law, save the usages and customs of Indians." *Id.* at 328. The court concluded that Alaska was not Indian country, except for the purpose of control of alcoholic beverages, and that the rule of *Ex Parte Crow Dog*, 109 U.S. 556, 3 S.Ct. 396, 27 L.Ed. 1030 (1883), that the District Court of Dakota Territory lacked jurisdiction to try an Indian who had murdered another Indian because he was subject to the tribal law, did not apply to Alaska Indians:

> The United States has at no time recognized any tribal independence or relations among these Indians, has never treated with them in any capacity, but from every Act of Congress in relation to the people of this territory it is clearly inferable that they have been and now are regarded as dependent subjects, amenable to the penal laws of the United

States, and subject to the jurisdiction of its courts. . . .

*Id.*

*Third.* In 1899, Congress enacted a detailed criminal code [12] superseding the criminal laws of Oregon which had been adopted for Alaska by reference in the Organic Act of 1884. In enacting local legislation such as this, "the national government . . . acts as the state governments act within their several limits in administering the ordinary rights of person and property." *In re Dana*, 68 Fed. 886, 899–900 (D.C.N.Y.1895); *United States v. Doo–Noch–Keen*, 2 Alaska 624, 626 (1905); Report, *supra* note 7, at 88–89. Either the Indian Major Crimes Act,[13] or tribal law, depending on the nature of the crime, and not the 1899 Alaska Criminal Code would apply to Natives within Native villages if Native villages were sovereign or located in "Indian country." However, Congress enacted a statute in 1909 [14] which made it quite clear that the 1899 Criminal Code was to be applicable.

The 1909 Act empowered the Attorney General of the United States to appoint "any person employed in the Alaska School Service" as a special peace officer with authority "to arrest . . . any Native of the District of Alaska charged with the violation of any provisions of the [1899] Criminal Code of Alaska." The only schools under the jurisdiction of the Alaska School Service were Native schools in Native villages. Report, *supra* note 7, at 89. "Therefore, it is obvious that Congress considered the criminal code of Alaska to be applicable to Indians not living in white communities." *United States v. Booth*, 161 F.Supp. 269 (Alaska 1958).

*Fourth.*

In 1900 the Congress replaced the Oregon Civil Code with a detailed Alaska Civil Code. 31 Stat. 321 (1900). Like the 1899 Alaska Criminal Code, nothing in the legislative history of the 1900 Alaska Civil Code indicates that the Congress

11. Report of the Governor of Alaska (1886); Report, *supra* note 7, at 78.

12. 30 Stat. 1253 (1899).

13. 23 Stat. 362 (1885).

14. 35 Stat. 837 (1909).

intended to exempt Alaska Natives living in Native villages from the purview of the Civil Code.

Report, *supra* note 7, at 90 (footnote integrated into text).

*Fifth.*

In 1912, some 45 years after first asserting jurisdiction over Alaska, Congress established a territorial legislature to which it delegated a significant segment of its criminal and civil jurisdiction over the territory.[141] Section 9 of the 1912 Act extended the legislative power of the territorial legislature "to all rightful subjects of legislation not inconsistent with the Constitution and laws of the United States." Section 9 then specifically exempted a list of subjects from the legislature's criminal and civil jurisdiction.[142] Alaska Natives and Native villages were not included on the list and there is no evidence in the legislative history of the 1912 Act that Congress intended to limit the territorial legislature's civil and criminal jurisdiction over Alaska Natives living in Native villages.

---

141. 37 Stat. 512 (1912).

142. Congress prohibited the territorial legislature from enacting legislation which conveyed federal lands, taxed property of the United States, imposed discriminatory taxes on nonresidents, granted exclusive franchises or special privileges, authorized gambling, lotteries, or the manufacture or sale of alcohol, appropriated money to private schools, issued bonds or borrowed money, or resulted in an unbalanced budget or ununiform taxation.

Report, *supra* note 7, at 90–91.

The territorial legislature did enact laws governing Alaska Natives living in Native villages. "One of the 1913 Legislature's first enactments was a statute which compelled Native children to attend Bureau of Education Schools and established the failure of a Native parent to send his or her child to school as a criminal offense."[15] The second territorial legislature in 1915 enacted a law authorizing Alaska Natives living in Native villages with forty or more residents to establish "a self-governing village organization for the purpose of governing certain local affairs...." Ch. 11, § 1, SLA 1915. According to the Report:

The 1915 Act is a contemporaneous expression of the territorial legislature's

15. Ch. 44, § 3, SLA 1913; Report, *supra* note 7, at 91.

understanding that Congress had delegated the legislature's civil jurisdiction over the internal form and powers of self-government in Native villages and that the area within and surrounding such villages was not Indian country. Report, *supra* note 7, at 94. Further, the territorial legislature levied and collected taxes from Alaska Natives living in Native villages to the same extent that it levied and collected taxes from other residents. *E.g.*, Ch. 29, § 1, SLA 1919; Report, *supra* note 7, at 97. Where Indians have sovereign powers, states and territories lack jurisdiction to tax them. F. Cohen, *Handbook of Federal Indian Law* 406 (1982); Report, *supra* note 7, at 97.

4. Neither the Alaska Indian Reorganization Act of 1936 nor subsequent Congressional legislation has granted or recognized sovereign status to Alaska Native groups.

The Indian Reorganization Act[16] (IRA) was designed to encourage Indians to "revitalize their self-government through the adoption of constitutions and bylaws and through the creation of chartered corporations, with power to conduct the business and economic affairs of the tribe." *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 151, 93 S.Ct. 1267, 1272, 36 L.Ed.2d 114, 121 (1973). Section 16 of the IRA empowers an Indian tribe, "or tribes residing on the same reservation" to adopt a constitution and by-laws subject to approval of the Secretary of the Interior. 25 U.S.C. § 476. Section 17 authorized the Secretary to issue charters of incorporation to tribes. 25 U.S.C. § 477.

When the IRA was initially passed in 1934, section 16 but not section 17 was applicable to Alaska. Since section 16 was limited to a tribe or tribes residing on a reservation and Alaska had few reservations, its applicability was quite limited.[17] This was changed by the Alaska Indian Reorganization Act, 49 Stat. 1250 (1936), which in section 1 extended section 17 and some other sections of the IRA to Alaska with the following proviso:

PROVIDED, That groups of Indians in Alaska not recognized prior to May 1, 1936 as bands or tribes, but having a common bond of occupation, or association, or residence within a well-defined

16. 25 U.S.C. § 461 et seq. (1982), 48 Stat. 988 (1934).

17. Report, *supra* note 7, at 108 n. 74.

neighborhood, community or rural district, may organize to adopt constitutions and by-laws and to receive charters of incorporation and federal loans under §§ 10, 16, and 17 ... of the [IRA].

Section 2 of the Act authorized the Secretary of the Interior to designate Indian reservations in Alaska and to withdraw public lands "actually occupied by Indians or Eskimos" for that purpose.

The proviso language of section 1 of the Alaska Indian Reorganization Act "assumed that Alaska Natives were not members of federally recognized Indian tribes...." Report, *supra* note 7, at 110–11.[18] It was thus an express Congressional statement applicable to most Native groups in Alaska that they had not been recognized as tribes.

The more controversial section 2 of the Act, which empowered the Secretary to create reservations in Alaska, was regarded by the Interior Department as necessary to protect economic rights of Alaska Natives. Report, *supra* note 7, at 109, 111. Reservations were also thought to be a necessary precondition to native communities' exercising local government powers under section 16 of the IRA. As Secretary Ickes stated in his letter to the House Committee on Indian Affairs accompanying the Bill: "[I]f native communities of Alaska are to set up systems of local government, it will be necessary to stipulate the geographical limits of their jurisdictions. Reservations set up by the Secretary of the Interior will accomplish this." [19]

Stevens Village does not have a reservation and, insofar as the record shows, never had one. It was organized under section 16 of the IRA and the proviso of section 1 of the Alaska IRA. However, consistent with the legislative history of the Alaska IRA, the constitution of Stevens Village does not give it general police power—the power to keep order—except on "any reserve set aside by the federal government for the village." [20] Withholding the general police power was accomplished under Interior Department instructions which stated in part: "The power to prescribe ordinances for civil government, relating particularly to law and order, may extend only to such lands as may be held as an Indian reservation for the use of the community...." [21]

Since Stevens Village was never granted a reservation, the power of local government has never been extended to it. In our view, the mere approval of a section 16 constitution for Stevens Village by the Secretary of the Interior, which itself withholds the power of local government to the Village, does not suffice to afford the Village tribal status for the purpose of application of the doctrine of tribal sovereign immunity.

In summary, the Alaska Indian Reorganization Act is important for two reasons. First, it expressly states that Native groups in Alaska have not been accorded tribal recognition. Second, it sets forth a means by which Native groups might achieve self-governing status. However, in

---

**18.** The House Committee on Indian Affairs said that this proviso "is necessary because of the peculiar nontribal organizations under which the Alaska Indians operate. They have no tribal organization as the term is understood generally." H.Rep. No. 2244, 74th Cong., 2d Sess. (1936).

**19.** H.Rep. No. 2447, 74th Cong., 2d Sess. 3–5 (1936) (letter from Harold Ickes to Honorable Will Rogers), *reprinted in* Report, *supra* note 7, at 112.

**20.** Article IV, § 1 of the Constitution of the Native Village of Stevens provides:

The Village shall have the following powers:

To do all things for the common good which it has done or has had the right to do in the past and which are not against Federal law and such Territorial law as may apply.

To deal with the Federal and Territorial Governments on matters which interest the Village, to stop any giving or taking away of

Village lands or other property without its consent, and to get legal aid, as set forth in the act of June 18, 1934.

To control the use by members or nonmembers of any reserve set aside by the Federal Government for the Village and to keep order in the reserve.

To guard and to foster native life, arts and possessions and native customs not against law.

Only the conditional third clause is a grant of power unique to government; the other powers, while important, are common to corporations and fraternal organizations.

**21.** Dept. of Interior, Instructions for Organizations In Alaska Under The Reorganization Act of June 18, 1934 (48 Stat. 984) And The Alaska Act of May 1, 1936 (49 Stat. 1250) And The Amendments Thereto, Instruction I(a) (December 22, 1937), *reprinted in* Report, *supra* note 7, at 113.

the case of Stevens Village that status was not achieved.[22]

We see nothing in legislation passed subsequent to the Alaska Indian Reorganization Act which constitutes a recognition of tribal sovereign authority. To the contrary, passage of the Alaska Native Claims Settlement Act (ANCSA)[23] evidences Congress's intent that non-reservation villages be largely subject to state law. The policy of ANCSA is expressed in section 2(b):

the settlement should be accomplished rapidly, with certainty, in conformity with the real economic and social needs of Natives, without litigation, with maximum participation by Natives in decisions affecting their rights and property, without establishing any permanent racially defined institutions, rights, privileges, or obligations, without creating a reservation system or lengthy wardship or trusteeship, and without adding to the categories of property and institutions enjoying special tax privileges or to the legislation establishing special relationships between the United States government and the State of Alaska....

43 U.S.C. § 1601(b).

ANCSA grants fee simple title in Native lands to regional and village corporations which are organized under state law and which are to be treated as any other Alaska corporations, with temporary exceptions as to the alienability of stock. Id. §§ 1606, 1607 (1982). The funds paid under ANCSA are paid to the regional corporations.[24] Id. § 1605. After a temporary period, ANCSA

lands are subject to state and local taxation. Id. § 1620. ANCSA abolishes all reservations in Alaska except the Annette Island Reserve. Id. § 1618. ANCSA gives either state chartered municipalities or the state itself at least 1,280 acres of the land underlying each village. Id. § 1613. Significantly, this grant does not go to IRA corporations, which would have been logical recipients if they were meant to have a role in local government.[25] Indeed, there is nothing in the legislative history of ANCSA which remotely suggests that IRA villages are to be recognized as having a government role.

5. Conclusion

In a series of enactments following the Treaty of Cession and extending into the first third of this century, Congress has demonstrated its intent that Alaska Native communities not be accorded sovereign tribal status. The historical accuracy of this conclusion was expressly recognized in the proviso to the Alaska Indian Reorganization Act and, although that Act afforded a mechanism by which self-governing status might be achieved by Native communities, the mechanism was not utilized in the case of Stevens Village. No enactment subsequent to the Alaska Indian Reorganization Act granted or recognized tribal sovereign authority in Alaska. For these reasons, and in accordance with our opinions in *Atkinson* and *Metlakatla,* we conclude that Stevens Village is not entitled to utilize the defense of tribal sovereign immunity.

---

**22.** The parties briefed another IRA issue in this case: whether section 16 of the IRA, 25 U.S.C. § 476 (1982), prevents the execution against Stevens Village's assets without its consent. Entities organized under section 16 of the IRA are vested with the power "to prevent the sale, disposition, lease, or encumbrance of tribal lands, interests in lands, or other tribal assets without the consent of the tribe." However, this appeal is from a money judgment, not from an order characterizing assets as subject to execution. The question of what, if any, assets are available to satisfy the judgment should be raised in the trial court in a post-judgment proceeding.

**23.** 43 U.S.C. § 1601 et seq. (1982).

**24.** One purpose served by the doctrine of tribal sovereign immunity is to give special protection to Indian lands and money. *Atkinson v. Haldane,* 569 P.2d at 160. Congress, by granting Alaska Natives' lands and money to state regulated corporations which are not exempt from suit, and without imposing significant restraints on the alienation of the lands, has evidently

concluded that the special protection of immunity was not necessary or desirable for the great bulk of Native property.

**25.** Section 1613(c)(3) as amended, provides:
[T]he Village Corporation shall then convey to any Municipal Corporation in the Native village or to the State in trust for any Municipal Corporation established in the Native village in the future, title to the remaining surface estate of the improved land on which the Native village is located and as much additional land as is necessary for community expansion, and appropriate rights-of-way for public use, and other foreseeable community needs: *Provided,* That the amount of lands to be transferred to the Municipal Corporation or in trust shall be no less than 1,280 acres unless the Village Corporation and the Municipal Corporation or the State in trust can agree in writing on an amount which is less than one thousand two hundred and eighty acres....

### B. The Lower Court Erred in Finding that the Contract was Enforceable Despite Allegations that it Violated Federal Procurement Regulations

Stevens Village also moved to dismiss AMP's claim on the ground that the contract was unenforceable because it violated federal and state procurement regulations. The trial court denied this motion, holding that "if in fact there is a violation, any violation has been waived, the Federal government's waived it, the State government's waived it, and the Village has—the parties to this action have waived any—any violation."

Case law is clear that violations of procurement regulations may render a contract unenforceable. *Comdisco, Inc. v. United States,* 756 F.2d 569, 576 (7th cir. 1985); *Quinn v. Gulf and Western Corp.,* 644 F.2d 89 (2d Cir.1981); *Schoenbrod v. United States,* 410 F.2d 400, 404, 187 Ct.Cl. 627 (1969); *New York Mail & Newspaper Transp. Co. v. United States,* 154 F.Supp. 271, 276, 139 Ct.Cl. 751 (1957), *cert. denied,* 355 U.S. 904, 78 S.Ct. 332, 2 L.Ed.2d 260 (1957). This same rule is applied to cases involving violations of agency regulations that are contained in manuals and circulars, as in this case, rather than statutes. *Schoenbrod,* 410 F.2d at 402; *Chatterton v. Waverly Terminal Co.,* 49 F.Supp. 545, 547 (D.N.J.1943).

The contract at issue here clearly violated federal procurement procedures required by the Office of Management and Budget (OMB) Circular A–102 Attachment O. The contract was not competitively negotiated, and it contained no provision for termination by the grantee. Moreover, there is evidence that the former village chief was given a job on the electrification project by AMP—a job that AMP's predecessors had refused to give him. Since the former village chief participated in selecting AMP, it appears that the contract was entered in violation of the no-conflict-of-interest provision contained in Circular A–102.

Stevens Village also asserts that the contract violated federal prohibitions against contingent fee contracts. AMP responds that the only federally funded project worked on by AMP was the electrification project, which was governed by the amendment to the contract that provided for hourly rate compensation. AMP's position is not supported by the record. The lower court found assertions in Daniel Slaby's affidavit, submitted in support of AMP's motion for summary judgment, to be true. That affidavit contained the following:

> d. Additional project/grants that I worked on included preparation of the [Stevens Village] capital improvement program submitted to the Alaska State Legislature (item B), a *HUD CDBG* [Community Development Block Grant] for developing a revolving housing loan program, a *HUD* jobs project for developing a fisheries cooperative and processing plant on the Yukon River (item C), and two CRA grant requests for logging and fuel storage (items E & F). I worked on these grants based on the contractual agreement which included deferral of fee payment until receipt of the grant.

Thus, in addition to the electrification project, Slaby worked on several federally funded projects for Stevens Village on a contingent fee arrangement in violation of the federal procurement procedures.[26]

The lower court's finding of waiver by the federal and state government is not supported by the record. Nor did the court offer any rationale for this finding when it announced its decision. Private parties cannot waive the requirements of such regulations. *Chatterton,* 49 F.Supp. at 547.

AMP argues that it was Stevens Village's responsibility under the procurement procedures to advertise for competing bids and to include the required provisions in the contract and that Stevens Village should not be allowed to capitalize on its failure to fulfill that responsibility. But one obvious and important purpose of the

---

**26.** Unlike OMB Circular A–102 Attachment O, the procurement procedures included in the state grant contract contain no express indication that they are generally applied. In other words, it cannot be assumed that because the state procedures are made a condition of one state grant, that the identical procedures will be required as conditions to another grant. Assuming that they do apply generally, a similar conclusion obtains with regard to work on the state projects listed by Slaby.

procurement procedures is to ensure that public funds are spent as the government intended them to be. When faced with a similar case, the Court of Claims held that the United States could not be estopped to deny the validity of contract provisions which violated federal procurement regulations. The court found that the United States could not be bound by those terms. *Yosemite Park and Curry Co. v. United States*, 582 F.2d 552, 560, 217 Ct.Cl. 360 (1978).

Nonetheless, the court also found: "[I]t is equally clear that the Government bargained for, and received the benefit of YPC's services.... For this reason we hold the plaintiff is entitled to a *quantum meruit* recovery for the reasonable value of the services received by defendant." *Id.* A similar award is appropriate here.

The jury was instructed solely on breach of contract measures of damages. The case must, therefore, be remanded for a retrial of the damages issue based on a *quantum meruit* theory.[27]

AFFIRMED in part, REMANDED in part.

RABINOWITZ, Chief Justice, joined by COMPTON, Justice, dissenting.

I dissent from Part II. A. of the court's opinion which addresses the issue of sover-

eign immunity. In my view Congress has never stated with sufficient clarity an intent to waive the sovereign immunity of Alaska Native villages. While I agree that the federal government has never expressly recognized Alaska Native villages as tribes for purposes of sovereign immunity, it is firmly established that a historically sovereign tribe is immune from suit, even in the absence of federal recognition, until Congress or the tribe expressly waives its immunity. Accordingly, I would remand this case for a factual determination as to whether Stevens Village possesses the attributes of a sovereign Indian tribe that would entitle it to sovereign immunity.[1]

I.

The court holds that "Congress has demonstrated its intent that Alaska Native communities not be accorded sovereign tribal status," and that therefore "Stevens Village is not entitled to utilize the defense of tribal sovereign immunity." It is true that if Congress waived the Village's sovereign immunity, the Village would be barred from utilizing this defense. "[T]ribal sovereignty ... is subject to the superior and plenary control of Congress." *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58, 98 S.Ct. 1670, 1677, 56 L.Ed.2d 106, 115 (1978).

However, if Congress is to waive[2] a tribe's sovereign immunity, it must clearly

---

**27.** Stevens Village also argued that its contract with AMP was a personal service contract which was terminable at the will of either party. Because we find that the contract is not enforceable because it violates procurement regulations, we need not address this issue.

**1.** In an unpublished decision, the Federal District Court for the District of Alaska recently addressed the precise issue presented in the instant case. *See Native Village of Tyonek v. Puckett*, No. A82–369 Civil, transcript of decision (D.Alaska Dec. 3, 1986). In that case, the Native Village of Tyonek, an IRA section 16 corporation, was attempting as plaintiff to enforce a Village ordinance prohibiting non-members from residing in the Village. The defendants counterclaimed, but the court concluded that the counterclaim was barred by sovereign immunity.

The federal court persuasively and expressly rejected the two principal arguments made by

the court in the instant case: (1) that federal recognition is a prerequisite to tribal sovereign immunity, *id.* at 23, and (2) that the Alaska Native Claims Settlement Act (ANCSA), 43 U.S. C.A. §§ 1601–1629a (1986), was a waiver of "the immunity of village governments organized under IRA section 16." *Id.* at 24 n. 13. After carefully considering the history of the Village and the effects of ANCSA, *id.* at 4–9, the District Court concluded that the Village was entitled to sovereign immunity, which neither it nor Congress had waived. *Id.* at 30.

**2.** The court's opinion does not explain whether Congress waived or discontinued the villages' sovereign immunity, or somehow declared that the immunity never existed. Whatever the case may be, any congressional expression of intent must meet the strict standard applied to waiver. Any lesser standard would run afoul of the settled principle that "statutes passed for the

express this intent: "It is settled that a waiver of sovereign immunity *'cannot be implied* but must be *unequivocally expressed.'*" *Id.* (emphasis added; citation omitted). Accordingly, the Ninth Circuit Court of Appeals has "rejected the contention that congressional enactments unrelated to immunity may implicitly grant authority to bring suit against Indian tribes." *Chemehuevi Indian Tribe v. California State Bd. of Equalization,* 757 F.2d 1047, 1053 (9th Cir.) (compulsory counterclaim requirement of Rule 13(a) of the Federal Rules of Civil Procedure held not to be waiver of tribal immunity), *rev'd on other grounds,* 474 U.S. 9, 106 S.Ct. 289, 88 L.Ed.2d 9 (1985).

This court has previously recognized these principles. In *Atkinson v. Haldane,* 569 P.2d 151, 167 (Alaska 1977), we stated: "[S]overeign immunity ... [is] waived only if it is clear from the unambiguous language of [the statute] and its legislative history that Congress intended such a waiver." In the case at bar, the court fails to observe these canons and infers a congressional waiver of immunity from a battery of enactments that do not address the issue of sovereign immunity.

The court first cites numerous pre–1936 enactments and judicial decisions suggesting that Native villages were at that time subject to state law and not considered "Indian country." None of these enactments, however, contained an express waiver of sovereign immunity. When Congress subjects an Indian tribe to state jurisdiction, it does not implicitly strip the tribe of its inherent sovereignty. For example, Public Law 280, 67 Stat. 588, 589 (1953) explicitly granted to certain states, including Alaska, extensive civil and criminal jur-

isdiction over Indian tribes. *See* 18 U.S. C.A. § 1162 (1984); 28 U.S.C.A. § 1360 (Supp.1987). Even this broad grant of jurisdiction, however, was not sufficient to waive sovereign immunity. The Supreme Court recently held: "We have never read Pub L 280 to constitute a waiver of tribal sovereign immunity, nor found Pub L 280 to represent an abandonment of the federal interest in guarding Indian self-governance." *Three Affiliated Tribes of the Fort Berthold Reservation v. Wold Engineering,* 476 U.S. 877, 892, 106 S.Ct. 2305, 2314, 90 L.Ed.2d 881, 894 (1986). In short, state jurisdiction over an Indian tribe is not inconsistent with tribal sovereignty in general or with tribal sovereign immunity in particular. Thus, nothing in any of the pre–1936 enactments cited by the court constitutes a waiver of sovereign immunity.

The court next turns to the Indian Reorganization Act (IRA), 25 U.S.C.A. §§ 461–479 (1983). The court cites no provision of the Act which remotely resembles a waiver of sovereign immunity.[3] Indeed, it is somewhat perplexing even to infer a waiver from the provisions of the IRA. One of the clear purposes of the IRA was to revitalize tribal self-government, *see, e.g., Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 151–52, 93 S.Ct. 1267, 1272, 36 L.Ed.2d 114, 121 (1973), and sovereign immunity "is a necessary corollary to Indian sovereignty and self-governance." *Three Affiliated Tribes,* 476 U.S. at 890, 106 S.Ct. at 2313, 90 L.Ed.2d at 894. The United States Supreme Court has held that "[t]he Reorganization Act did not strip Indian tribes ... of their historic immunity from state and local control." *Mescalero Apache Tribe,* 411 U.S. at 152, 93 S.Ct. at 1267, 36 L.Ed.2d at 121.[4] Although I agree with the court's

---

benefit of dependent Indian tribes ... are to be liberally construed, doubtful expressions being resolved in favor of the Indians." *Bryan v. Itasca County,* 426 U.S. 373, 392, 96 S.Ct. 2102, 2112, 48 L.Ed.2d 710, 723 (1976) (quoting *Alaska Pac. Fisheries v. United States,* 248 U.S. 78, 89, 39 S.Ct. 40, 42, 63 L.Ed. 138, 141 (1918)).

**3.** The court finds in the Alaska amendment to the IRA "an express Congressional statement applicable to most Native groups in Alaska that they had not been recognized as tribes." *See* 25 U.S.C.A. § 473a (1983). It is true that this section acknowledges that some Native groups had not been recognized as tribes as of 1936. However, the lack of federal recognition of tribal

status is not fatal to a tribe's claim of sovereign immunity. *See infra* Part II. In my view, this section is not an "unequivocal expression" of Congress's intent to waive the villages' sovereign immunity.

**4.** The court suggests that Alaska Native villages incorporated under IRA section 16 possess no governmental powers because they were never granted reservations. I disagree for two reasons. First, this argument nullifies the plain language of the Alaska amendment to the IRA, which on its face allows "groups of Indians in Alaska" to incorporate under section 16 without any mention of reservations. *See* 25 U.S.C.A. § 473a (1983).

conclusion that IRA incorporation alone does not constitute federal recognition of tribal status, *see infra* note 6, I cannot agree that this Act, when combined with the previous enactments, somehow constitutes a waiver of sovereign immunity.

Similarly, in ANCSA, the final enactment considered by the court, Congress did not address immunity. The court does not cite a single provision of ANCSA that directly or indirectly suggests a waiver of sovereign immunity. Rather, the court infers this intent, an approach which is at odds with the rule that a waiver of immunity must be clearly expressed.

One of the provisions the court uses to bolster its waiver conclusion is the section that permits taxation of certain lands granted pursuant to ANCSA. 43 U.S.C.A. § 1620(d) (1986). In my view this section supports the opposite conclusion, because it is an excellent example of the type of clear expression Congress must make to waive an immunity, in this case tax immunity.

The court concludes that ANCSA "evidences Congress's intent that non-reservation villages be largely subject to state law." Even assuming that this is true, it

does not deprive the villages of sovereign immunity. As discussed above in connection with the earlier enactments and Public Law 280, Congress does not necessarily waive the sovereign immunity of ·Indian tribes when it subjects them to some measure of state law.[5]

In short, nothing in ANCSA, the IRA, or any of the earlier enactments approaches the type of express congressional statement that is necessary to waive sovereign immunity. Thus, if Stevens Village is a "tribe" under common law principles of tribal sovereign immunity, this court lacks jurisdiction to adjudicate the claim in the instant case.

## II.

The court also concludes that an Indian tribe may not avail itself of sovereign immunity in the absence of express recognition of tribal status by either Congress or the executive branch of the federal government. This argument has been considered and rejected by the federal courts, is inconsistent with the underlying basis of the doctrine of tribal sovereign immunity, and is not supported by our own decisions.[6]

Second, this argument would negate many constitutions approved under section 16, including that of Stevens Village, which explicitly grant powers of self-government even in the absence of a reservation. The Constitution of the Native Village of Stevens grants the Village the power "[t]o do all things for the common good which it has done or has had the right to do in the past...." Constitution and By-laws of the Native Village of Stevens, art. IV, § 1. Thus, the power to control the use of any reservation was merely one component of a much broader grant of power. If the Village historically exercised powers of a sovereign tribe not inconsistent with applicable federal and territorial law, its constitution clearly grants it the power to continue in this capacity.

I further disagree with the court's conclusion that the Alaska Native Claims Settlement Act (ANCSA), 43 U.S.C.A. §§ 1601–1629a (1986), demonstrates Congress's intent that IRA corporations in Alaska "were [not] meant to have a role in local government." Local self-government was the very purpose of IRA section 16 corporations, and there is no indication whatsoever that Congress intended ANCSA to repeal IRA section 16 in Alaska. If IRA corporations were to have no further role in local government, it is difficult to explain why the Native Village of Stevens coordinated the electrifica-

tion project in the instant case, with the cooperation of the federal Department of Housing and Urban Development. The record leaves no doubt that Stevens Village in fact continues to serve a governmental role with the assistance of federal agencies.

5. Recently this court again recognized that ambiguities in ANCSA, as in other federal statutes for the benefit of Indians, are to be construed in favor of the Indians. *Hakala v. Atxam Corp.*, 753 P.2d 1144, 1147 (Alaska, 1988).

6. I agree with the court that IRA incorporation alone does not constitute federal recognition of tribal status for purposes of sovereign immunity, but my reasons are somewhat different.

As the court's opinion notes, the Alaska amendment to the IRA allowed any "group[ ] of Indians in Alaska" with a "common bond" to incorporate. 25 U.S.C.A. § 473a (1983). The "common bond" language is extremely broad. In fact, it is nearly identical to that in a previously-enacted statute providing for the organization of federal credit unions having nothing to do with Indians. 12 U.S.C.A. § 1759 (1980). Whether or not so intended by Congress, the expansive "common bond" language has resulted in reorganization under IRA section 16 of Alaska Native groups that clearly had no histori-

In support of its express federal recognition analysis, the court relies on *Atkinson v. Haldane*, 569 P.2d 151 (Alaska 1977). However, as we noted in *Atkinson*, sovereign immunity is a federal doctrine, and this court is bound under the supremacy clause, U.S. Const. art. VI, cl. 2, to follow the holdings of the United States Supreme Court. 596 P.2d at 163.

In my opinion the position taken by the court in regard to the necessity for express federal recognition is in direct conflict with federal law. The First Circuit Court of Appeals faced this issue directly and, relying on Supreme Court precedent, concluded that express or implied federal recognition was not necessary to establish sovereign immunity.

We are cited to, and our research has uncovered, no case which *conditions* the invocation of sovereign immunity on the factors emphasized by the state or appellant: formal federal recognition of the particular tribe by treaty or statute, a prolonged course of dealing between the tribe and the federal government, geographic location, the tribe's warlike nature, the absence of state protection of a tribe or the continued full exercise of a tribe's sovereign powers.

The absence of authority is not surprising, for the analysis urged by appellant and the state seems to us to fundamentally misconceive basic principles of federal Indian law. In effect, their approach would condition the exercise of an aspect of sovereignty on a showing that it had been granted to the tribe by the federal government, either by explicit recognition or implicitly through a course of dealing. As the Supreme Court recently explained, however, the proper analysis is just the reverse:

"The powers of Indian tribes are, in general, *'inherent powers of a limited sovereignty which has never been extin-*

*guished.'* F. Cohen, Handbook of Federal Indian Law 122 (1945) (emphasis in original)

. . . .

"Indian tribes are, of course, no longer 'possessed of the full attributes of sovereignty.' ... Their incorporation within the territory of the United States, and their acceptance of its protection, necessarily divested them of some aspects of the sovereignty which they had previously exercised. By specific treaty provision they yielded up other sovereign powers; by statute, in the exercise of its plenary control, Congress has removed still others.

"But our cases recognize that the Indian tribes have not given up their full sovereignty.... The sovereignty that the Indian tribes retain is of a unique and limited character. It exists only at the sufferance of Congress and is subject to complete defeasance. But until Congress acts, the tribes retain their existing sovereign powers. *In sum, Indian tribes still possess those aspects of sovereignty not withdrawn by treaty or statute, or by implication as a necessary result of their dependent status* ...*"

*Bottomly v. Passamaquoddy Tribe*, 599 F.2d 1061, 1065–66 (1st Cir.1979) (quoting *United States v. Wheeler*, 435 U.S. 313, 322–23, 98 S.Ct. 1079, 1085–86, 55 L.Ed.2d 303, 312–13 (1978)) (emphasis in original or added by *Bottomly* court; footnotes omitted).[7] Since Congress had not waived the tribe's sovereign immunity, the court held that the doctrine barred the suit even though Congress had never explicitly or implicitly recognized the tribe. 599 F.2d at 1066.

Although the Supreme Court has never addressed this issue, analysis of that court's relevant decisions leads to the same conclusion the First Circuit reached. Im-

cal existence as tribal governmental units. For example, the Ketchikan Indian Corporation is organized under both IRA sections 16 and 17. Yet its members "are not descended from any particular Indian community, but are natives of differing groups who happen to live in Ketchikan." *Board of Equalization v. Alaska Native Bhd. and Sisterhood, Camp. No. 14*, 666 P.2d 1015, 1025 (Alaska 1983) (Rabinowitz, J., con-

curring). Therefore, it seems unlikely that Congress intended to recognize all IRA section 16 corporations as tribes for purposes of sovereign immunity.

7. *Accord Board of Equalization v. Alaska Native Bhd. and Sisterhood, Camp No. 14*, 666 P.2d 1015, 1024 (Alaska 1983) (Rabinowitz, J., concurring).

munity from suit is one attribute of sovereignty retained by Indian tribes, which are sovereign entities predating annexation by the United States. "It is as though the immunity which was theirs as sovereigns passed to the United States for their benefit, as their tribal properties did." *United States v. United States Fidelity & Guar. Co.*, 309 U.S. 506, 512–13, 60 S.Ct. 653, 656, 84 L.Ed. 894, 899 (1940).

Therefore, there is no need for the federal government expressly to recognize the sovereignty of a tribe for the tribe to retain most attributes of its sovereignty. As the Supreme Court explained just last year, "Because the Tribe retains all inherent attributes of sovereignty that have not been divested by the Federal Government, the proper inference from silence ... is that the sovereign power ... remains intact." *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 107 S.Ct. 971, 978, 94 L.Ed.2d 10, 21 (1987) (quoting *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 149 n. 14, 102 S.Ct. 894, 907–08 n. 14, 71 L.Ed.2d 21, 37 n. 14 (1982)). *See also Wheeler*, 435 U.S. at 322–23, 98 S.Ct. at 1085–86, 55 L.Ed.2d at 312–13 (quoted above).

In the instant case Congress has neither expressly recognized the Village as a tribe for purposes of sovereign immunity nor expressly waived the Village's immunity. Therefore, if the Village is in fact a historically sovereign tribe, this court is bound to honor its immunity from suit.

The court cites three Supreme Court cases pertaining to the subject of sovereign immunity: *Three Affiliated Tribes of the Fort Berthold Reservation v. Wold Engineering*, 476 U.S. 877, 890, 106 S.Ct. 2305, 2313, 90 L.Ed.2d 881, 894 (1986); *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58, 98 S.Ct. 1670, 1677, 56 L.Ed.2d 106, 115 (1978); and *U.S. Fidelity*, 309 U.S. at 512–13, 60 S.Ct. at 656, 84 L.Ed. at 898–99. In each of these cases there was apparently some federal recognition of the tribe. However, there is no indication that the Court relied on this fact in finding the tribes entitled to sovereign immunity. None of the three cases explicitly mentions federal recognition of tribal status in their respective discussions of sovereign immuni-

ty. To the contrary, the discussion in each suggests that the basis of immunity is historical sovereign status rather than any federal recognition. *See Three Affiliated Tribes*, 476 U.S. at 890, 106 S.Ct. at 2313, 90 L.Ed.2d at 894 ("The common law sovereign immunity possessed by the Tribe is a necessary corollary to Indian sovereignty and self-governance."); *Santa Clara Pueblo*, 436 U.S. at 58, 98 S.Ct. at 1677, 56 L.Ed.2d at 115 ("Indian tribes have long been recognized as possessing the common-law immunity from suit traditionally enjoyed by sovereign powers."); *U.S. Fidelity*, 309 U.S. at 512, 60 S.Ct. at 656, 84 L.Ed. at 899 ("These Indian Nations are exempt from suit without congressional authorization. It is as though the immunity which was theirs as sovereigns passed to the United States for their benefit, as their tribal properties did.").[8]

It is true that the basis of the finding of tribal sovereign immunity in *Atkinson v. Haldane*, 569 P.2d 151 (Alaska 1977) was express federal recognition. However, contrary to the implication of the court's opinion today, nothing in the *Atkinson* opinion suggests that this is the only way sovereign immunity can be established. Once Congress or the executive branch has recognized a tribe, the question is nonjusticiable, and there is no further need for the court to explore the historical basis for the finding of sovereignty. As we explained, "Once the executive branch has determined that the Metlakatla Indian Community is an Indian tribe, which is a nonjusticiable political question, the Community is entitled to all the benefits of tribal status." *Id.* at 163. Even in the absence of such recognition, however, we remain bound to honor the sovereignty of a historical Indian tribe. We recognized this implicitly in describing immunity from suit as a "retain[ed] ... vestige[ ]" of a formerly complete sovereignty. *Id.* at 160.

### III.

Having determined that the federal government has not expressly recognized Stevens Village as a tribe for purposes of

---

**8.** *See also United States v. Oregon*, 657 F.2d 1009, 1013 (9th Cir.1981) ("Indian tribes enjoy immunity because they are sovereigns predating the constitution, and immunity is thought necessary to preserve autonomous tribal existence.") (per Kennedy, J.).

sovereign immunity, I would remand the case to afford the Village the opportunity to make a factual showing as to its alleged tribal status.

It appears that no court has ever fashioned a definition of "tribe" specifically for purposes of determining sovereign immunity. Unfortunately, reference to definitions of "tribe" for other purposes does not necessarily provide a definitive answer in the sovereign immunity context. A leading authority explains:

> The term tribe has no universal legal definition. There is no single federal statute defining an Indian tribe for all purposes, although the Constitution and many federal statutes and regulations make use of the term. In most instances the question of tribal existence can be resolved by reference to a treaty, statute, executive order, or agreement recognizing the tribe in question. In other cases the definition of tribe, like many other such generic terms, will depend in part on the context and purposes for which the term is used.

*Felix S. Cohen's Handbook of Federal Indian Law* 3 (R. Strickland ed. 1982) (footnote omitted).

One of the most often cited definitions of "tribe" appears in *Montoya v. United States,* 180 U.S. 261, 21 S.Ct. 358, 45 L.Ed. 521 (1901), a case not involving sovereign immunity. In that case, the Supreme Court stated, "By a 'tribe' we understand a body of Indians of the same or a similar race, united in a community under one leadership or government, and inhabiting a particular though sometimes ill-defined territory...." *Id.* at 266, 21 S.Ct. at 359, 45 L.Ed. at 523. Some modern courts have followed this definition for other purposes. *See Mashpee Tribe v. Secretary of the Interior,* 820 F.2d 480, 482 (1st Cir.1987); *Joint Tribal Council of the Passamaquoddy Tribe v. Morton,* 528 F.2d 370, 377 n. 8 (1st Cir.1975).

I think this definition sets forth minimum requirements for tribal sovereign immunity. As discussed above, however, immunity from suit derives from the sovereignty that a tribe possessed at the time the United States asserted its superior sovereignty. Thus, in addition to the requirements of the *Montoya* definition, there is also a need for a showing of historical sovereignty.

The Bureau of Indian Affairs (BIA) has considered this question in adopting regulations to acknowledge the existence of Indian tribes entitled to the "immunities and privileges" of other recognized tribes. 25 C.F.R. § 83.2 (1987). Presumably sovereign immunity is among the immunities recognized. It appears that the BIA has not recognized IRA corporations in Alaska as tribes pursuant to these regulations.[9]

---

**9.** Alaska Native groups are eligible to petition for tribal recognition under these regulations "on the same basis as groups in the lower 48 States." 43 Fed.Reg. 39,361 (1978). Although the procedures originally provided that Alaska IRA corporations were not among those Alaska Native groups eligible to petition, *id.,* the BIA published a list in 1982 that include numerous Alaska IRA corporations, including Stevens Village. 47 Fed.Reg. 53,133, 53,135 (1982). This list, which was separate from the list of recognized lower 48 tribes, was entitled "Alaska Native Entities Recognized and Eligible to Receive Services From the United States Bureau of Indian Affairs." *Id.* at 53,133. Following this caption was an explanation of the purpose of the list:

> While eligibility for services administered by the Bureau of Indian Affairs is generally limited to historical tribes and communities of Indians residing on reservations, and their members, unique circumstances have made eligible additional entities in Alaska which are not historial [sic] tribes. Such circumstances have resulted in multiple, overlapping eligibil-

ity of native entities in Alaska. To alleviate any confusion which might arise from publication of a multiple eligibility listing, the following preliminary list shows those entities to which the Bureau of Indian Affairs gives priority for purposes of funding and services. *Id.* at 53,133–34. In subsequent years, the BIA has continued the practice of listing Alaska "Native Entities" separately from lower 48 tribes, although the 1982 explanation quoted above has not been republished. *See* 50 Fed.Reg. 6058 (1985); 51 Fed.Reg. 25,118 (1986).

Thus it appears that the BIA has listed Alaska Native groups eligible for services, but has explicitly declined to specify which groups in Alaska might be recognized as historical tribes. *See also Board of Equalization v. Alaska Native Bhd. and Sisterhood, Camp No. 14,* 666 P.2d 1015, 1024 n. 2 (Rabinowitz, J., concurring). *But see* Report of the Governor's Task Force on Federal–State–Tribal Relations 65–66 (Feb. 14, 1986) (citing unwritten communications from Interior Department officials stating that deletion of above-quoted explanation was specifically intended as recognition of entities as tribes).

Nevertheless, these regulations can provide significant guidance in the present inquiry.

The factors considered by the BIA in these regulations are: historical identification as "American Indian" or "aboriginal," 25 C.F.R. § 83.7(a); historical habitation of a particular area or community, *id.* § 83.-7(b); historical political influence or authority over members, *id.* § 83.7(c); established though not necessarily written governing procedures and membership criteria, *id.* § 83.7(d); and a membership consisting primarily of descendants of a distinct historical tribe not members of any other North American tribe. *Id.* § 83.7(e) & (f). These requirements essentially track the *Montoya* definition, with the added requirement that each element of the test be shown to have existed historically.[10] In *Price v. Hawaii*, 764 F.2d 623, 627 (9th Cir.1985) the Ninth Circuit employed these factors in determining tribal status for purposes of federal court jurisdiction under 28 U.S.C. § 1362.

In my view the BIA standards provide an appropriate test for determining whether an entity is a tribe for purposes of sovereign immunity. I am not unmindful of the fact that these factors were developed with the experiences and characteristics of Indians in the lower 48 states in mind. Therefore, I would view these factors merely as guidelines that may be tailored to accommodate the unique history and circumstances of Native groups in Alaska. Thus our trial courts should consider other factors that may be relevant in determining whether a particular Alaska Native group has proved its tribal status.[11]

AMP argues that Stevens Village did not meet its burden of proof because it did not present any evidence of its historical tribal

status. The Village responds that it has "reams of documentation," but declined to present it in the trial court because AMP did not contest the Village's tribal status. The record is incomplete and does not clearly reveal the arguments that AMP made in the superior court. However, neither party could easily have anticipated the standards this court would adopt in proving tribal status. Given the importance of the issue presented, I would remand to provide Stevens Village with the opportunity to prove its historical tribal status under the standards set forth above.

### IV.

As stated earlier I agree with the court that there has never been any express federal recognition of Alaska Native villages as tribes for purposes of sovereign immunity. However, it is equally clear that Congress has never expressly denied sovereign immunity to these villages. The unfortunate but inescapable fact is that Congress has steadfastly avoided defining the extent and limits of Native sovereignty in Alaska. Illustrative of this fact are the recent "1991" amendments to ANCSA, in which Congress declared, "[N]o provision of this Act shall ... confer on, or deny to, any Native organization any degree of sovereign governmental authority over lands ... or persons in Alaska...." Alaska Native Claims Settlement Act Amendments of 1987, Pub.L. No. 100–241, § 2(8)(B), 101 Stat. 1788, 1789 (1988). *See also id.* § 17(a), 101 Stat. 1814. The Senate Report on the bill stated:

> It is the Committee's clear intent that this bill leave parties in the sovereignty issue, in exactly the same status as if the amendments were not enacted.

10. Obviously no IRA section 16 corporations existed before 1934, but this is not fatal to such a corporation's showing of historical tribal sovereignty. The framework of a tribal government may change or even dissolve without extinguishing sovereign immunity. "The public policy which exempted the dependent as well as the dominant sovereignties from suit without consent continues this immunity *even after dissolution of the tribal government*." *U.S. Fidelity,* 309 U.S. at 512, 60 S.Ct. at 656, 84 L.Ed. at 898–99 (emphasis added; footnote omitted).

11. This view of the sovereignty of Native villages is consistent with a decided trend in feder-

al legislation to treat Alaska Natives on an equal basis with Indians in the lower 48 states. *See, e.g.,* Indian Self–Determination Act, 25 U.S.C.A. § 450b(b) (1983) (definition of tribe includes an Alaska Native village or regional or village corporation established pursuant to ANCSA); Indian Financing Act, 25 U.S.C.A. § 1452(c) (1983) (same); Indian Child Welfare Act, 25 U.S.C.A. § 1903(8) (1983) (definition of tribe includes Alaska Native villages as defined in 43 U.S.C. § 1602(c)); Indian Tribal Governmental Tax Status Act, 26 U.S.C.A. § 7701(a)(40)(A) (Supp. 1988) (definition of tribe includes Alaska Native entities whom the Secretary of the Interior deems to be exercising governmental functions).

This is an issue which should be left to the courts in interpreting applicable law and that these amendments should play no substantive or procedural role in such court decisions.

S.Rep. No. 201, 100th Cong., 1st Sess. 23 (1987), U.S.Code Cong. & Admin.News 1988, pp. 3269, 3274.

Thus, it appears that Congress has chosen to abdicate to the courts on this issue. In the absence of any express federal recognition or waiver of sovereign immunity, this court is bound to follow the common law principles of tribal sovereign immunity announced by the Supreme Court. In my view the court's opinion fails to do this.